[No. S019556. July 30, 1992.]

BANK OF THE WEST, Petitioner, v.
THE SUPERIOR COURT OF CONTRA COSTA COUNTY, Respondent;
INDUSTRIAL INDEMNITY COMPANY et al., Real Parties in Interest.

## Counsel

Severson & Werson, Jan T. Chilton and William L. Stern for Petitioner.

Martha Chuchill, Thomas & Porrozzo, Michael H. Porrozzo, Anderson, Kill, Olick & Oshinsky, Eugene R. Anderson, William G. Passannante, Cotchett, Illston & Pitre, Joseph W. Cotchett, Susan Illston, Marie Seth Weiner, Morgan, Ruby, Schofield, Franich & Fredkin, Allen J. Ruby, Lexie D. Schroeder, Thomas T. Anderson, Sherry N. Bass, David A. Beck, Morrison & Hecker, P. John Owen, Ann S. DuRoss, Richard J. Osterman, Jr., Joan E. Smiley, Nossaman, Guthner, Knox & Elliott, Kurt W. Melchior, Jared E. Peterson, Alison S. Hightower, Patricia Lee Connors, Wilson, Sonsini, Goodrich & Rosati, Denise M. Amantea, Richard F. Cauley, Howard, Rice, Nemerovski, Canady, Robertson & Falk, Denis T. Rice, Helane L. Morrison, Kathryn M. Nelson, H. Joseph Escher III and Alan T. Foster as Amici Curiae on behalf of Petitioner.

No appearance for Respondent.

Lawrence O. Monin, Michael A. Mathews, Andre Hassid, Crosby, Heafey, Roach & May, Raoul D. Kennedy, Peter W. Davis, Richard de Saint Phalle, Dolores A. Dalton, Paul H. Breslin, Frank Gilbert, Jesse I. Santana, James C. Martin and James H. Kallianis, Jr., for Real Parties in Interest.

Baker, Hostetler, McCutchen & Black, Philip K. Verleger, Donna R. Black, Martin J. McTigue, Jr., Proskauer, Rose, Goetz & Mendelsohn, Phyllis E. Andelin, McCormick, Barstow, Sheppard, Wayte & Carruth, James P. Wagoner, James H. Wilkins, Robert K. Landen, Morton, Lulofs & Allen, Michael Charles Comyns, Horvitz & Levy, Ellis J. Horvitz, Peter Abrahams, Lisa Perrochet, Alan I. Widiss, Cummins & White, James D. Otto, Kent M. Bridwell, Haight, Brown & Bonesteel, Roy G. Weatherup, Lawrence A.

Tabb, Greines, Martin, Stein & Richland, Irving H. Greines and Feris M. Greenberger as Amici Curiae on behalf of Real Parties in Interest.

## OPINION

PANELLI, J.—Comprehensive general liability (CGL) insurance policies generally include coverage for "advertising injury." This coverage, as ordinarily written, applies to "damages" the insured must pay for injury arising out of "unfair competition" occurring in the course of the insured's "advertising activities." We granted review to consider questions regarding the scope of coverage afforded by this standard policy language. As we shall explain, we hold that the CGL policy does not cover claims for advertising injury that arose under the Unfair Business Practices Act. (Bus. & Prof. Code, § 17200 et seq.[1])

### FACTS AND PROCEDURAL HISTORY

Plaintiffs Industrial Indemnity Company and Industrial Insurance Company of Hawaii, Ltd. (collectively Industrial) have sued for a declaratory judgment determining their obligations under a CGL policy issued to Central Bank. Defendant Bank of the West is Central Bank's successor in interest. (This opinion refers to both entities collectively as the Bank.) Judgment has not been entered. However, by granting Industrial's motion for summary adjudication of issues the trial court has decided that language in the Bank's CGL policy relating to "advertising injury" does not give rise to coverage for the particular claims involved in this case. It is this order that we are reviewing. We are not called upon to decide any other coverage issues or any issues involving the duty to defend.

The coverage dispute arises out of the Bank's settlement of a consumer class action entitled Fallat v. Central Bank (Super. Ct., S.F., No. 865597). To summarize the relevant facts, the Bank developed a program to finance automobile insurance premiums for consumers who preferred to pay in installments. The Bank did not advertise the so-called "Coast Program" directly to consumers. Instead, the Bank informed insurance agents that it was willing to lend money to finance premiums and that it would pay fees to agents who referred such business to the Bank. Nor did consumers apply directly to the Bank for loans. Instead, when a consumer expressed a desire to extend payment the insurance agent would ask for a down payment of 20 to 30 percent, obtain the consumer's power of attorney, and apply for a loan

---

[1] All further references to statutes are to the Business and Professions Code except as noted or as the context may require.

in the consumer's name. Sometime later, the consumer would receive notice of the loan's acceptance by the Bank and disclosure of its terms. Until receiving such notice, many consumers were unaware both of the Coast Program's existence and that loans had in fact been made. Many were also unaware of the terms of the loans, which included interest at rates of over 126 percent, as well as substantial fees and penalties. Some consumers, upon receiving notification, sought to cancel their loans by paying the balance due. However, the Bank did not permit cancellation.

In their complaint against the Bank, the Fallat plaintiffs alleged violations of the federal Truth-in-Lending Act (15 U.S.C. § 1601 et seq.), the Unruh Act (Civ. Code, § 1801 et seq.), the Unfair Business Practices Act (§ 17200 et seq.), and a state statute that prohibits excessive liquidated damages (Civ. Code, § 1671). The Fallat plaintiffs also alleged that the loans were unconscionable and that the Bank had breached the covenant of good faith and fair dealing.

The case was removed to federal court, which remanded all but the federal claims. (*Fallat* v. *Central Bank* (N.D. Cal., No. C-86-6521 RFP).) On the Fallat plaintiffs' motion for partial summary judgment, the federal court held that the Bank had violated the Truth-in-Lending Act by miscalculating and misdisclosing the interest rate and by failing to give disclosures required by federal law before the loans were consummated. (See 15 U.S.C. § 1638.) In its order, the court explained that the Bank's miscalculation of interest "resulted in an understatement of an already astronomical APR by over 20 percentage points." The court also found that the additional "error" of untimely disclosure "was built into the incentives given to insurance agents responsible for recommending the Coast Program to their clients." As the court explained, "[t]o the extent insurance agents' compensation is tied to their level of policy sales, such agents have a strong incentive to 'sell' a loan program like the Coast Program *without* making the required [Truth-in-Lending Act] disclosures that could jeopardize a potential sale."

Several months after the federal court ruled, the state court in Fallat addressed the parties' motions for summary adjudication of issues related to the state law claims. The court's order disposing of these motions eliminated the plaintiffs' claims under the Unruh Act (Civ. Code, § 1801 et seq.) and the covenant of good faith and fair dealing but allowed the remaining claims to proceed.

The federal and state court rulings considerably narrowed the scope of the dispute between the Fallat plaintiffs and the Bank. Although the plaintiffs continued to seek injunctive and declaratory relief, the only remaining

claims under which plaintiffs sought to recover money were their claims under the Unfair Business Practices Act (§ 17203), the statute prohibiting excessive liquidated damages (Civ. Code, § 1671), and the Truth-in-Lending Act (15 U.S.C. § 1640). In their complaint, the Fallat plaintiffs incorporated each of their claims into their request for relief under the Unfair Business Practices Act. Indeed, the Fallat plaintiffs' only demand for money, other than for punitive damages and attorneys' fees, was for "restitution . . . of any and all amounts collected by defendants through their unlawful and unfair business practices . . . ." (Cf. § 17203 [authorizing such relief].)

It was in this posture that the Fallat case settled. Pursuant to a class-wide settlement agreement, the Bank paid the plaintiffs $500,000 and attorneys fees, and agreed to make several changes in the operation of its Coast Program. The settlement agreement did not characterize the $500,000 payment as attributable to any particular claim. However, in the parties' joint motion for approval of the settlement the Fallat plaintiffs' counsel expressed the opinion that $500,000 represented the amount that could be recovered either as the return of unlawful liquidated damages (Civ. Code, § 1671) or as the maximum statutory recovery under the Truth-in-Lending Act (15 U.S.C. § 1640(a)(2)(b)).

At some point before the Fallat parties agreed to settle, the Bank began to assert that its CGL policy covered the claims in that action. Industrial responded by filing a complaint for declaratory judgment, asking the court to declare that the policy did not provide coverage. The Bank cross-complained for breach of the insurance contract.

The ensuing litigation focused on a single theory of coverage: The Bank sought to prove that the amounts it had paid to the Fallat plaintiffs were "damages" for "unfair competition" that occurred in the course of the Bank's "advertising activities." To support its argument, the Bank looked to the statutory definition of "unfair competition" contained in the Unfair Business Practices Act. (§ 17200.)[2] Industrial, in contrast, sought to prove that the policy referred to the common law tort of unfair competition rather than to conduct prohibited by the act. Industrial also sought to prove that insurance was not available for restitutionary relief under the act,[3] and that the Fallat plaintiffs' claims had not occurred "in the course of [the Bank's] advertising activities" within the meaning of the policy.

---

[2]Section 17200 provides:

"As used in this chapter, *unfair competition* shall mean and include unlawful, unfair or fraudulent business practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by Chapter 1 (commencing with Section 17500) of Part 3 of Division 7 of the Business and Professions Code." (Italics added.)

[3]The only nonpunitive monetary relief available under the Unfair Business Practices Act is the form of restitution described in section 17203:

Industrial moved for summary adjudication of issues to obtain a ruling on the Bank's theory of coverage. The superior court granted the motion. In its order, the court decided the following issues in Industrial's favor, thus holding, in effect, that coverage for "advertising injury" did not include the Fallat plaintiffs' claims:

"1. The phrase 'unfair competition' in the policies insuring [the] Bank and issued by Industrial . . . means the common law tort of unfair competition;

"2. The *Fallat* claim does not allege, and could not be amended to allege, the common law tort of unfair competition;

"3. The policies insuring [the] Bank issued by Industrial . . . do not cover claims for equitable or restitutionary relief such as provided for in Business and Professions Code Section 17203; and

"4. The acts on which the *Fallat* claim was based did not occur in the course of [the] Bank's or the Coast Program's 'advertising activities' within the meaning of the policies referred to in paragraph 1."

When the Bank challenged this ruling in a petition for writ of mandate, the Court of Appeal found coverage and vacated the trial court's order. The court did not conclude that the Fallat plaintiffs had alleged common law claims for unfair competition. Instead, contrary to the weight of authority, the court held that the policy term "unfair competition" was ambiguous and could refer either to the common law or to conduct prohibited by the Unfair Business Practices Act. The court resolved the perceived ambiguity against Industrial.

In response to Industrial's further argument that insurable "damages" do not include the restoration of amounts obtained through violations of the Unfair Business Practices Act, the Court of Appeal concluded that the Fallat action could be viewed as seeking compensatory damages in addition to statutory restitution. Although the act does not authorize compensatory damages, the court believed that the law on this point was uncertain. The court also resolved this perceived uncertainty in the law against Industrial. Finally, the court held that the instances of "unfair competition" alleged in

---

"Any person performing or proposing to perform an act of unfair competition within this state may be enjoined in any court of competent jurisdiction. *The court may make such orders or judgments*, including the appointment of a receiver, as may be necessary to prevent the use or employment by any person of any practice which constitutes unfair competition, as defined in this chapter, or *as may be necessary to restore to any person in interest any money* or property, real or personal, *which may have been acquired by means of such unfair competition.*" (Italics added.)

the Fallat complaint had "occurred in the course of [the Bank's] advertising activities" within the meaning of the policy.

We granted Industrial's petition for review.

## DISCUSSION

The ultimate question before us is whether language in the CGL policy concerning "advertising injury" provides coverage for the claims asserted in the Fallat action and, thus, for the Bank's payment to settle such claims.

The relevant policy language provides: "The company [Industrial] will pay on behalf of the insured [the Bank] all sums which the insured shall become legally obligated to pay as *damages* because of . . . *advertising injury* to which this insurance applies . . . . 'Advertising injury' means injury arising out of an offense committed during the policy period occurring in the course of the named insured's advertising activities, if such injury arises out of libel, slander, defamation, violation of right of privacy, *unfair competition*, or infringement of copyright, title or slogan." (Italics added.)

This language appears in a "Liability Extended Coverage Endorsement" attached to the Bank's CGL policy. Through various renewals, the policy was in effect from April 1, 1984, to April 1, 1986. The language of the endorsement generally follows that of a form drafted in 1973 by the Insurance Services Office, Inc. (ISO), an organization that develops standard policy forms for the insurance industry and collects statistical data and estimates risks relevant to the forms. (See generally *In re Insurance Antitrust Litigation* (9th Cir. 1991) 938 F.2d 919.) In 1986 ISO developed a revised CGL policy that replaced the term "unfair competition" with "style of doing business." However, several insurance companies continue to offer coverage under the older form and many coverage disputes under the older form, including this case, remain pending.

A. *The Policy Term "Unfair Competition" Does Not Refer to Conduct Prohibited by the Unfair Business Practices Act.*

The Court of Appeal, as already mentioned, held that the CGL policy's reference to "unfair competition" was ambiguous and could refer either to statutory or to common law claims. Industrial challenges this conclusion.

The Court of Appeal's decision in this case stands virtually alone among published opinions in holding that the CGL policy's standard language

covers claims under a state statute prohibiting unfair business practices. The authority against coverage for such claims is overwhelming. (*Seaboard Sur. Co. v. Ralph Williams' N.W. Chrys. P., Inc.* (1973) 81 Wn.2d 740, [504 P.2d 1139, 1140-1143]; *Ruder & Finn Inc. v. Seaboard Sur. Co.* (1981) 52 N.Y.2d 663 [439 N.Y.S.2d. 858, 422 N.E.2d. 518, 522]; *Pine Top Ins. v. Public Util. D. 1 of Chelan Cty.* (E.D.Wash. 1987) 676 F.Supp. 212, 215-217; *Globe Indem. Co. v. First American State Bank* (W.D.Wash. 1989) 720 F.Supp. 853, 855-857; *Westfield Ins. Co. v. TWT, Inc.* (N.D.Cal. 1989) 723 F.Supp. 492, 496; *Boggs v. Whitaker, Lipp & Helea, Inc.* (1990) 56 Wn.App. 583 [784 P.2d 1273, 1275-1276]; *Aetna Cas. & Sur. Co. v. Trans World Assur. Co.* (N.D.Cal. 1990) 745 F.Supp. 1524, 1528-1529; *Tigera Group, Inc. v. Commerce & Industry Ins.* (N.D.Cal. 1991) 753 F.Supp. 858, 859-861; *Nationwide Mut. Ins. Co. v. Dynasty Solar, Inc.* (N.D.Cal. 1990) 753 F.Supp. 853, 855-858.)

In two published opinions, lower federal courts in the Ninth Circuit have found *a duty to defend* claims under the Unfair Business Practices Act. (*American States Insurance Co. v. Canyon Creek* (N.D.Cal. 1991) 786 F.Supp. 821, 827-828; *Keating v. National Union Fire Ins. Co.* (C.D.Cal. 1990) 754 F.Supp. 1431, 1435-1437, 1441.) However, these holdings are against the clear weight of authority both generally and in the Ninth Circuit. (See the cases cited above.)

The majority of courts have concluded that the term "unfair competition" as used in policy language defining "advertising injury" refers to the common law tort of unfair competition rather than to conduct prohibited by unfair business practice statutes. As we shall explain, this conclusion substantially limits the scope of coverage.

The common law tort of unfair competition is generally thought to be synonymous with the act of "passing off" one's goods as those of another. The tort developed as an equitable remedy against the wrongful exploitation of trade names and common law trademarks that were not otherwise entitled to legal protection. (See generally 1 Callmann, Unfair Competition, Trademarks & Monopolies (4th ed. 1981) §§ 2.01-2.03.) According to some authorities, the tort also includes acts analogous to "passing off," such as the sale of confusingly similar products, by which a person exploits a competitor's reputation in the market. (See Rest., Torts, §§ 711-743; see also 1 Callmann, *supra,* § 2.04.)

Expansion of legal remedies against deceptive business practices occurred not so much through the common law as through the enactment of statutes, particularly the Federal Trade Commission Act. (15 U.S.C. § 45.) Of particular importance was a 1938 amendment to the act, which expanded the

Federal Trade Commission's (FTC) preexisting jurisdiction over "unfair methods of competition" to include "unfair or deceptive acts or practices." (52 Stat. 111 (1938), amending 15 U.S.C. § 45.) This amendment, which became a model for state regulatory statutes, gave the FTC jurisdiction over unfair business practices that harmed the public, whether or not such practices also implicated the interests of competitors. (See *FTC* v. *Sperry & Hutchinson Co.* (1972) 405 U.S. 233, 239-244 [31 L.Ed.2d 170, 176-179, 92 S.Ct. 898.) A host of so-called "little FTC Acts" followed, including California's Unfair Business Practices Act. (§ 17200 et seq.; see also Civ. Code, former § 3369.)

■ The primary purpose of these statutes was to "extend[ ] to the entire consuming public the protection once afforded only to business competitors." (*Barquis* v. *Merchants Collection Assn.* (1972) 7 Cal.3d 94, 109 [101 Cal.Rptr. 745, 496 P.2d 817], interpreting Civ. Code, former § 3369.) The common law tort of unfair competition, which required a showing of competitive injury, did not provide an effective remedy for consumers. (See *Committee on Children's Television, Inc.* v. *General Foods Corp.* (1983) 35 Cal.3d 197, 209 [197 Cal.Rptr. 783, 673 P.2d 660]; *Barquis* v. *Merchants Collection Assn.*, *supra*, 7 Cal.3d at pp. 109-110.) In contrast, statutory "unfair competition" extends to all unfair and deceptive business practices. For this reason, the statutory definition of "unfair competition" "cannot be equated with the common law definition . . . ." (*Barquis* v. *Merchants Collection Assn.*, *supra*, 7 Cal.3d at p. 109, interpreting Civ. Code, former § 3369.)

■ The majority of published opinions, as already mentioned, hold that insurance coverage for "advertising injury" due to "unfair competition" is limited to claims under the common law and excludes statutory claims. The Bank takes issue with these holdings. ■ Because the CGL policy does not define "unfair competition," that term, according to the Bank, is ambiguous and must be construed against the insurer. (See *Gray* v. *Zurich Insurance Co.* (1966) 65 Cal.2d 263, 269 [54 Cal.Rptr. 104, 419 P.2d 168].)

The Bank has invoked this rule of construction too early in the interpretive process. While insurance contracts have special features, they are still contracts to which the ordinary rules of contractual interpretation apply. (See *AIU Ins. Co.* v. *Superior Court* (1990) 51 Cal.3d 807, 822 [274 Cal.Rptr. 820, 799 P.2d 1253] (*AIU*).) The fundamental goal of contractual interpretation is to give effect to the mutual intention of the parties. (Civ. Code, § 1636.) If contractual language is clear and explicit, it governs. (Civ. Code, § 1638.) On the other hand, "[i]f the terms of a promise are in any respect ambiguous or uncertain, it must be interpreted in the sense in which the promisor

believed, at the time of making it, that the promisee understood it." (*Id.*, § 1649; see *AIU, supra,* 51 Cal.3d at p. 822.) This rule, as applied to a promise of coverage in an insurance policy, protects not the subjective beliefs of the insurer but, rather, "the objectively reasonable expectations of the insured." (*AIU, supra,* at p. 822.) Only if this rule does not resolve the ambiguity do we then resolve it against the insurer. (See *AIU, supra,* at p. 822.)

In summary, a court that is faced with an argument for coverage based on assertedly ambiguous policy language must first attempt to determine whether coverage is consistent with the insured's objectively reasonable expectations. In so doing, the court must interpret the language in context, with regard to its intended function in the policy. (*Producers Dairy Delivery Co.* v. *Sentry Ins. Co.* (1986) 41 Cal.3d 903, 916-917 & fn. 7 [226 Cal.Rptr. 558, 718 P.2d 920].) This is because *"language in a contract* must be construed in the context of that instrument as a whole, and in the circumstances of that case, and *cannot be found to be ambiguous in the abstract."* (*Id.,* at p. 916, fn. 7, italics added; cf. Civ. Code, § 1641.)

██ It is obviously possible to argue that the term "unfair competition," in the abstract, might refer to statutory claims. As the Bank correctly observes, policy terms must be read in their "ordinary and popular sense" (Civ. Code, § 1644; see also *AIU, supra,* 51 Cal.3d at p. 822; cf. *Reserve Ins. Co.* v. *Pisciotta* (1982) 30 Cal.3d 800, 807 [180 Cal.Rptr. 628, 640 P.2d 764]), and definitions of "unfair competition" in standard dictionaries generally include acts that harm the public as well as acts that harm competitors only. One dictionary, for example, defines "unfair competition" as "business competition effected by an act that is deceptive and in effect a fraud on the public or that otherwise violates the legal and equitable rights of a competitor or the public." (See Webster's Third New Internat. Dict. (unabridged ed. 1961) p. 2494; cf. Random House Dict. of the English Language (unabridged ed. 1979) p. 1549 [giving "unfair competition" as a synonym for "unfair practices"].)

While the foregoing argument is probably correct as a matter of abstract philology, it is defective as a matter of policy interpretation because it disregards the context. The policy does not purport to cover "unfair competition" in the abstract; instead, it covers *"damages"* for "advertising injury" caused by "unfair competition." Read in this context, the term "unfair competition" can only refer to a civil wrong that can support an award of damages.

Damages are available for common law unfair competition (see generally 4 Callmann, *supra,* §§ 22.48-22.51) and for each of the other wrongs

enumerated in the CGL policy's advertising injury coverage (i.e., libel, slander, defamation, violation of right of privacy, and infringement of copyright, title or slogan).

In contrast, damages are not available under section 17203. (*Dean Witter Reynolds, Inc.* v. *Superior Court* (1989) 211 Cal.App.3d 758, 774 [259 Cal.Rptr. 789]; *Industrial Indemnity Co.* v. *Superior Court* (1989) 209 Cal.App.3d 1093, 1095-1097 [257 Cal.Rptr. 655]; 11 Witkin, Summary of Cal. Law (9th ed. 1990) Equity, § 95, p. 776; see also *Chern* v. *Bank of America* (1976) 15 Cal.3d 866, 875 [127 Cal.Rptr. 110, 544 P.2d 1310] [interpreting the nearly identical language of section 17535].) The only nonpunitive monetary relief available under the Unfair Business Practices Act is the disgorgement of money that has been wrongfully obtained or, in the language of the statute, an order "restor[ing] . . . money . . . which may have been acquired by means of . . . unfair competition." (§ 17203; cf. §§ 17206, 17207 [penalties].)

The Bank argues that the term "damages" for insurance purposes includes virtually all forms of monetary relief, including disgorgement orders under section 17203. However, the argument is too broad. ■ It is well established that one may not insure against the risk of being ordered to return money or property that has been wrongfully acquired. Such orders do not award "damages" as that term is used in insurance policies. (See *Jaffe* v. *Cranford Ins. Co.* (1985) 168 Cal.App.3d 930, 934-935 [214 Cal.Rptr. 567]; *AIU, supra*, 51 Cal.3d at p. 836; see also *O'Neill Investigations* v. *Ill. Emp. Ins., etc.* (Alaska 1981) 636 P.2d 1170, 1173-1177; *Central Dauphin School* v. *American Cas. Co.* (1981) 493 Pa. 254 [426 A.2d 94, 95-97, 21 A.L.R.4th 884]; *Haines* v. *St. Paul Fire & Marine Ins. Co.* (D.Md. 1977) 428 F.Supp. 435, 439-442; *Seaboard Sur. Co.* v. *Ralph Williams' N.W. Chrys. P., Inc., supra*, 504 P.2d at pp. 1140-1143.)

■ To explain the conclusion that insurable damages do not include the costs of disgorgement under section 17203, it is necessary to review the scope and purpose of the Unfair Business Practices Act and its remedial provisions.

The Unfair Business Practices Act defines "unfair competition" as any "unlawful, unfair or fraudulent business practice and unfair, deceptive, untrue or misleading advertising . . . ." (§ 17200.) The Legislature intended this "sweeping language" to include " 'anything that can properly be called a business practice and that at the same time is forbidden by law.' " (*Barquis* v. *Merchants Collection Assn., supra*, 7 Cal.3d at pp. 111, 113, citation omitted.) In drafting the act, the Legislature deliberately traded the attributes of tort

law for speed and administrative simplicity. As a result, to state a claim under the act one need not plead and prove the elements of a tort. Instead, one need only show that "members of the public are likely to be deceived." (*Chern* v. *Bank of America, supra,* 15 Cal.3d at p. 876; see also *Committee on Children's Television, Inc.* v. *General Foods Corp., supra,* 35 Cal.3d at p. 211.)

Section 17203, which incorporates the broad, statutory definition of "unfair competition," permits "any court of competent jurisdiction" to enjoin "[a]ny person performing or proposing to perform an act of unfair competition . . . ." (§ 17203.) The section also authorizes courts to make such orders as "may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition." (*Ibid.*) The purpose of such orders is "to deter future violations of the unfair trade practice statute and to foreclose retention by the violator of its ill-gotten gains." (*Fletcher* v. *Security Pacific National Bank* (1979) 23 Cal.3d 442, 449 [153 Cal.Rptr. 28, 591 P.2d 51] [interpreting the nearly identical language of section 17535]; see also *People* v. *Superior Court (Jayhill)* (1973) 9 Cal.3d 283, 288-289 & fn. 3 [107 Cal.Rptr. 192, 507 P.2d 1400, 55 A.L.R.3d 191].) The Legislature considered this purpose so important that it authorized courts to order restitution without individualized proof of deception, reliance, and injury if necessary to prevent the use or employment of an unfair practice. (*Committee on Children's Television, Inc.* v. *General Foods Corp., supra,* 35 Cal.3d at p. 211; see also *Fletcher* v. *Security Pacific National Bank, supra,* 23 Cal.3d at pp. 449-453.)

If insurance coverage were available for monetary awards under the Unfair Business Practices Act, a person found to have violated the act would simply shift the loss to his insurer and, in effect, retain the proceeds of his unlawful conduct. Such a result would be inconsistent with the act's deterrent purpose. As we have previously explained, " '[t]o permit the [retention of even] a portion of the illicit profits, would impair the full impact of the deterrent force that is essential if adequate enforcement [of the law] is to be achieved. One requirement of such enforcement is a basic policy that those who have engaged in proscribed conduct surrender all profits flowing therefrom.' " (*Fletcher* v. *Security Pacific National Bank, supra,* 23 Cal.3d at p. 451, quoting *Securities & Exchange Com'n* v. *Golconda Mining Co.* (S.D.N.Y. 1971) 327 F.Supp. 257, 259-260 [brackets in *Fletcher*].)

The Court of Appeal below, which found coverage for statutory unfair competition claims under section 17203, sacrificed the deterrent goal of the Unfair Business Practices Act to a rule of construction, i.e., the principle that insurance policies should be interpreted to maximize coverage. The sacrifice,

however, is unnecessary if one applies the rule that insurable damages do not include costs incurred in disgorging money that has been wrongfully acquired. This rule bars coverage for claims under section 17203.

This was the reasoning of the court that first addressed the issue that is now before us. (*Seaboard Sur. Co.* v. *Ralph Williams' N.W. Chrys. P., Inc., supra,* 504 P.2d 1139 (*Seaboard*).) The insured in *Seaboard,* an automobile dealer, had been sued by the Attorney General of Washington for violations of Washington's Consumer Protection Act. The Washington statute, like California's Unfair Business Practices Act, prohibited "unfair methods of competition and unfair or deceptive acts or practices" and authorized the court to award injunctive relief and disgorgement but not damages. The dealer's liability insurer sued for declaratory relief to establish that it had no duty to defend under policy language providing coverage for "unfair competition" that caused "advertising injury." The Supreme Court of Washington held that the insurer had no duty to defend because the action did not threaten the insured with a judgment for "damages" within the meaning of the policy. (*Id.,* at pp. 1140-1143.)

The principle that underlies the *Seaboard* decision is recognized in California law. The leading case is *Jaffe* v. *Cranford Ins. Co., supra,* 168 Cal.App.3d 930 (*Jaffe*). The insured in *Jaffe,* a psychiatrist, was prosecuted by the Attorney General for the fraudulent receipt of Medi-Cal payments. The insured's malpractice insurer refused to provide a defense in the criminal action. After the insured was acquitted, he sued the insurer for reimbursement of his defense costs. Observing that his policy covered "damages," the insured argued that one consequence of a conviction might have been an order requiring him to reimburse the state for Medi-Cal overpayments. (See Welf. & Inst. Code, § 14172.)

The *Jaffe* court rejected the insured's argument as dependent on an overly broad interpretation of the term "damages." As the court explained, " '[d]amages' describes a payment made to compensate a party for injuries suffered. [In contrast, the return of Medi-Cal overpayments] is more properly characterized as restitutionary rather than compensatory in nature. The defendant is asked to return something he wrongfully received; he is not asked to compensate the plaintiff for injury suffered as a result of his conduct. At least absent demonstrably unusual circumstances, we have doubts whether an insurance policy which purported to insure a party against payments of a restitutionary nature would comport with public policy. Although the concept of 'restitution' may have a broader meaning in other contexts, we limit our reference to it here to situations in which the defendant is required to restore to the plaintiff that which was wrongfully acquired." (*Jaffe, supra,* 168 Cal.App.3d at p. 935.)

This reasoning has also found acceptance in other jurisdictions. For example, in *O'Neill Investigations* v. *Ill. Emp. Ins., etc., supra,* 636 P.2d 1170, the Supreme Court of Alaska held that a debt collector's professional liability insurance did not cover a claim under that state's Unfair Trade Practices and Consumer Protection Act for the restoration of money acquired from consumers through unfair collection practices. (See *id.,* at pp. 1173-1177.) In *Central Dauphin School* v. *American Cas. Co., supra,* 426 A.2d 94, 95-97, the Supreme Court of Pennsylvania held that a school district's liability insurance policy did not cover a claim by taxpayers for the return of unlawfully collected taxes. Similarly, in *Haines* v. *St. Paul Fire & Marine Ins. Co., supra,* 428 F.Supp. 435, 439-442, the federal court for the District of Maryland held that a law firm's professional liability insurance did not cover an action by the Securities Exchange Commission that threatened the insured with a judgment requiring it to disgorge attorneys' fees; the action did not seek "damages" within the meaning of the insurance policy.

The public policy rationale that underlies these holdings, explicitly or implicitly, is this: When the law requires a wrongdoer to disgorge money or property acquired through a violation of the law, to permit the wrongdoer to transfer the cost of disgorgement to an insurer would eliminate the incentive for obeying the law. Otherwise, the wrongdoer would retain the proceeds of his illegal acts, merely shifting his loss to an insurer. (Cf. *Jaffe, supra,* 168 Cal.App.3d at p. 935; *Central Dauphin School* v. *American Cas. Co., supra,* 426 A.2d at p. 96.)[4]

The Bank does not argue that monetary relief under the Unfair Business Practices Act is not intended to serve the goal of deterrence. Instead, the Bank argues that insurance for statutory restitution is permissible because the holding in *Jaffe, supra,* 168 Cal.App.3d 930, did not survive this court's decision in *AIU, supra,* 51 Cal.3d 807. To the contrary, *AIU* confirms the holding in *Jaffe.*

The insured in *AIU,* who had allowed hazardous wastes to contaminate groundwater, was ordered to reimburse the government for its cleanup and response costs under the Comprehensive Environmental Response, Compensation, and Liability Act. (42 U.S.C. § 9601 et seq.) One of the questions

---

[4]The Bank argues that Industrial waived the "public policy" issue by failing to raise it below. To the contrary, Industrial has advanced this position throughout the litigation. Citing *Jaffe, supra,* 168 Cal.App.3d 930, as authority, Industrial argued in its motion for summary adjudication that "[c]laims for . . . restitutionary relief . . . such as authorized by Sections 17200 et seq. do *not* entail 'damages' under liability insurance policies." Industrial prevailed on this issue in the trial court and renewed it in the Court of Appeal, which discussed the issue in its opinion.

Upon close examination, the Bank's claim of "waiver" boils down to the observation that Industrial did not attach the "public policy" label to its argument.

before us was whether the government's suit for reimbursement of cleanup costs was an action for "damages" within the meaning of a CGL policy. We held that the suit did seek "damages" because the judgment awarding reimbursement was analogous to a judgment awarding damages for injury to property, measured by the cost of restoring the property to its original condition. Under the applicable statutes, the government could have proceeded against the insured either by requiring the insured to take remedial action or by taking remedial action itself and suing for reimbursement. The government chose the latter alternative. (*AIU, supra,* 51 Cal.3d at pp. 829-837.)

The insurer in *AIU* argued that the *Jaffe* rule barred coverage for reimbursement of cleanup costs because such costs were a form of "restitution" rather than "damages." However, we rejected the analogy to *Jaffe* because "[r]eimbursement of response costs . . . is not restitutive in the narrow sense identified by *Jaffe* as inappropriate for insurance coverage." (*AIU, supra,* 51 Cal.3d at p. 836.)

Contrary to the Bank's argument, *AIU* did not overrule *Jaffe* or hold that any award capable of bearing the "restitution" label is insurable as "damages." We did hold in *AIU* that insurable "damages" include monetary awards that represent compensation for harm to third parties, even if such awards bear the label "restitution." However, we were also careful to note prior holdings to the effect that, "as a matter of public policy, an insured's payment of certain types of restitution cannot be covered by insurance." (*AIU, supra,* 51 Cal.3d at p. 836.) We mentioned two illustrations of the rule: *Jaffe, supra,* 168 Cal.App.3d 930, which held that liability insurance would not cover the insured's restitution of Medi-Cal overpayments, and *State Farm Fire & Cas. Co.* v. *Superior Court* (1987) 191 Cal.App.3d 74 [236 Cal.Rptr. 216], which held that insurance would not cover the insured's payment of statutory restitution to the victims of crime. To emphasize the distinction between what is insurable and what is not, we noted that *Jaffe* bars coverage only in " 'situations in which *the defendant is required to restore to the plaintiff that which was wrongfully acquired.*' " (*AIU, supra,* 51 Cal.3d at p. 836, quoting *Jaffe, supra,* 168 Cal.App.3d at p. 935, italics added.)

The Bank also contends that a rule of public policy barring coverage for actions under the Unfair Business Practices Act would contradict Insurance Code section 533.5. In this statute, the Legislature declared that "[n]o policy of insurance" shall provide "coverage" or "any duty to defend" in "any action or proceeding" brought under the Unfair Business Practices Act "by the Attorney General, any district attorney, any city prosecutor, or any

county counsel . . . ." While section 533.5 thus bars insurance in statutory unfair competition actions brought by the government, the Bank argues that the section also authorizes, by implication, insurance in actions brought by private plaintiffs.

The argument is easily met. The history of section 533.5 does not suggest that the Legislature gave any thought to the availability of insurance coverage in private actions under the Unfair Business Practices Act. As originally enacted, section 533.5 did not even refer to the act. Instead, it barred coverage in all civil and criminal actions, whatever the theory of liability, brought by the Attorney General, a district attorney, or a city prosecutor. (Stats. 1988, ch. 489, § 1, p. 1896.) In 1990, the Legislature limited the statute's reach to criminal actions and actions under the Unfair Business Practices Act. (Stats. 1990, ch. 1512, § 1.)

This legislative history might support the inference that the Legislature has equated actions under the Unfair Business Practices Act with criminal actions, at least for insurance purposes. (Obviously, the comparison does not advance the Bank's argument for coverage.) However, the legislative history does not support the additional inference that the Legislature actually considered the availability of insurance coverage in actions brought by private plaintiffs. On that point the history is silent. Lacking relevant legislation, the question can only be resolved by applying the more general principles of law on which we rely.

■ It remains to be considered whether the amount that the Bank paid to settle the Fallat action represented disgorgement under the Unfair Business Practices Act. The Bank strenuously argues that its payment did not represent disgorgement because the superior court had already dismissed, prior to settlement, the plaintiffs' claims under the Unruh Act (Civ. Code, § 1801 et seq.) for recovery of excessive finance charges. The claims still being asserted at the time of settlement were pursuant to a state statute prohibiting excessive liquidated damages (Civ. Code, § 1671) and the Truth-in-Lending Act (15 U.S.C. §§ 1638, 1640). The Bank asserts that these claims amounted to claims of "unfair competition" under the CGL policy because the Fallat plaintiffs incorporated them into their claim for statutory unfair competition under section 17203, which also survived summary adjudication.[5]

The problem with this argument is that it contradicts the Bank's theory of coverage. To argue for coverage, the Bank takes the position that the policy

[5]The superior court held that the Fallat complaint "[did] not allege, and could not be amended to allege, the *common law* tort of unfair competition." (Italics added.) This ruling followed the Bank's acquiescence in Industrial's argument that competitive injury is an element of common law unfair competition (*Committee on Children's Television, Inc.* v.

term "unfair competition" includes claims under the Unfair Business Practices Act. Next, to avoid the rule that disgorgement is not a form of "damages" for insurance purposes, the Bank argues that its settlement payment did not represent disgorgement. However, disgorgement is the only nonpunitive monetary remedy available under the Unfair Business Practices Act. (See § 17203 [authorizing relief "to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition"].) Thus, if the settlement payment did not represent disgorgement, it could not have been for a violation of the act. However, if the payment was not for a violation of the act, it could not have been for "unfair competition" and, hence, was not covered even under the Bank's broad definition of that term.

In summary, the Unfair Business Practices Act does not authorize an award of damages, and a definition of "unfair competition" that cannot support a claim for damages cannot reflect the objectively reasonable expectations of the insured. Accordingly, we hold that the policy term "unfair competition" does not refer to conduct that violates the Unfair Business Practices Act.[6] (§ 17200 et seq.) Because the context elucidates the meaning, there is no need to resort to the rule that ambiguities are resolved against the insurer. (See *AIU, supra,* 51 Cal.3d at p. 822.)

The Court of Appeal reached a different conclusion on this point because it believed that the case law was "in conflict as to whether damages are recoverable under section 17203." However, we perceive no conflict. In *Chern v. Bank of America, supra,* 15 Cal.3d 866, we expressly held that damages were not available under section 17535, another section of the Unfair Business Practices Act that authorizes courts to order the restoration of money acquired through misleading advertising. (15 Cal.3d at p. 875.) The language of section 17535 is nearly identical to that of section 17203,

---

*General Foods Corp., supra,* 35 Cal.3d at p. 209; *Barquis v. Merchants Collection Assn., supra,* 7 Cal.3d at pp. 109-110) and that the Fallat plaintiffs' claims did not implicate the interests of the Bank's competitors.

Now, the Bank argues that "competitive injury has been cast aside as a requirement for common-law unfair competition claims . . . ." However, common law cases cited by the Bank establish only that courts may enjoin the unfair use of trade names or the sale of confusingly similar goods. (E.g., *Academy of Motion Picture, etc. v. Benson* (1940) 15 Cal.2d 685 [104 P.2d 650]; *American Philatelic Soc. v. Claibourne* (1935) 3 Cal.2d 689 [46 P.2d 135].)

[6]The Bank argues that coverage restricted to claims of common law unfair competition would be illusory because a plaintiff must show fraud to recover damages under that theory (e.g., *Wood v. Peffer* (1942) 55 Cal.App.2d 116, 125-126 [130 P.2d 220]) and because Insurance Code section 533 bars insurance for losses "caused by the willful act of the insured." We see no occasion to address this argument. No common law claim is involved in this case and, regardless of the scope of coverage for such claims, it is clear that claims under the Unfair Business Practices Act are not covered.

which was based on the former. In addition, the history of section 17203 demonstrates that the Legislature expressly intended both sections to be "interpreted in the same way." (Assem. Com. of Research, Report on Assem. Bill. No. 3279 (1975-1976 Reg. Sess.), p. 1.) *Chern* effectively overruled the earlier, contrary holding in *United Farm Workers of America* v. *Superior Court* (1975) 47 Cal.App.3d 334, 344 [120 Cal.Rptr. 904], which the Court of Appeal in the case before us read to create a "conflict."

It is true that this court once expressly declined to decide a litigant's claim for compensatory damages under the Unfair Business Practices Act. (*Committee on Children's Television, Inc.* v. *General Foods Corp., supra,* 35 Cal.3d at p. 215; cf. *id.,* dis. opn. of Bird, C. J., at pp. 223-228 [opining that damages should be available under the Unfair Business Practices Act].) However, in view of *Chern*'s express holding that damages are not available under the act, the Court of Appeal read far too much into *Committee on Children's Television, Inc., supra.* Today, the point is too well settled to warrant extensive discussion.[7]

In conclusion, we hold that the superior court properly granted Industrial's motion for summary adjudication of issues on the theory that the *Fallat* complaint did not seek "damages" for "unfair competition" within the meaning of the CGL policy. The Court of Appeal's decision to the contrary was erroneous and must be reversed.

B. *The Fallat Plaintiffs' Injuries Did Not Occur "In the Course of" the Bank's Advertising Activities.*

The Bank's CGL policy covers "damages" for "unfair competition" only if such conduct "occur[s] in the course of the . . . insured's advertising activities." Because the Bank did not advertise its Coast Program to consumers, Industrial argues that the unlawful lending practices alleged in the *Fallat* complaint did not occur in the course of the Bank's advertising activities.

While we have concluded that the Fallat complaint did not seek "damages" for "unfair competition" within the meaning of the CGL policy, other

---

[7]See *Dean Witter Reynolds, Inc.* v. *Superior Court, supra,* 211 Cal.App.3d at page 774; *Industrial Indemnity Co.* v. *Superior Court, supra,* 209 Cal.App.3d at pages 1095-1097; see also *E.W. French & Sons, Inc.* v. *General Portland Inc.* (9th Cir. 1989) 885 F.2d 1392, 1401-1402; *Little Oil Co., Inc.* v. *Atlantic Richfield Co.* (9th Cir. 1988) 852 F.2d 441, 445; *Kates* v. *Crocker National Bank* (9th Cir. 1985) 776 F.2d 1396, 1398; *Burt on Behalf of McDonnell Douglas* v. *Danforth* (E.D.Mo. 1990) 742 F.Supp. 1043, 1052-1054; *Xerox Corp.* v. *Apple Computer, Inc.* (N.D.Cal. 1990) 734 F.Supp. 1542, 1550, footnote 14; *Newport Components* v. *NEC Home Electronics* (C.D.Cal. 1987) 671 F.Supp. 1525, 1550-1552; *Meta-Film Associates, Inc.* v. *MCA, Inc.* (C.D.Cal. 1984) 586 F.Supp. 1346, 1363; see also 11 Witkin, Summary of Cal. Law, *supra,* at page 776.

*United Farm Workers of America* v. *Superior Court, supra,* 47 Cal.App.3d 334, is disapproved to the extent it is inconsistent with our opinion.

questions about the scope of coverage for "advertising injury" continue to have substantial importance. For that reason we shall address, as an alternative, independent basis for our decision, the parties' arguments about the requisite connection between "advertising activities" and "advertising injury."

As already discussed, the state and federal court orders granting summary adjudication narrowed the Fallat plaintiffs' claims for monetary relief to a few claims based on unlawful lending practices. These included the claims under the Truth-in-Lending Act for failing to make timely and correct disclosures (15 U.S.C. §§ 1638, 1640) and under a state statute that prohibits excessive liquidated damages (Civ. Code, § 1671). In their complaint, the Fallat plaintiffs incorporated both of these claims into their request for disgorgement under the Unfair Business Practices Act. (§ 17203.) Arguing that the remaining claims thus amounted to "unfair competition," the Bank asserted a claim for coverage under the policy.

The trial court, in its order granting Industrial's motion for summary adjudication, found that "[t]he acts on which the *Fallat* claim was based did not occur in the course of [the Bank's] 'advertising activities' within the meaning of the policies . . . ." While the Bank advertised its Coast Program to insurance agents through representatives and trade journals, it does not appear that consumers were aware of these advertising activities. Thus, it is only with considerable difficulty that the Bank is able to argue that the alleged acts of "unfair competition" "occur[ed] in the course of . . . [the Bank's] advertising activities."

In order to base a claim for coverage on advertising directed to insurance agents, the Bank must take the difficult position that the CGL policy does not require a causal connection between "advertising activities" and "advertising injury." Instead, according to the Bank, there is coverage if any connection, however remote, exists between the Bank's advertisements and the lending practices that harmed the Fallat plaintiffs, even if the advertisements, themselves, did not cause the harm.

This argument has not found acceptance in other jurisdictions. Those courts that have addressed the issue in published opinions have rejected coverage claims based on injuries that did not have a causal connection with the insured's advertising activities. (*National Union Fire Ins. Co. v. Siliconix Inc.* (N.D.Cal. 1989) 729 F.Supp. 77, 79-80; *Meyers & Sons Corp. v. Zurich American Ins.* (1989) 74 N.Y.2d 298 [546 N.Y.S.2d 818, 545 N.E.2d 1206-1209]; *Lazzara Oil Co. v. Columbia Casualty Co.* (M.D.Fla. 1988) 683 F.Supp. 777, 780; cf. *First Bank & Trust Co. v. N.H. Ins. Group* (1983) 124 N.H. 417 [469 A.2d 1367, 1368].)

The reasoning that supports the requirement of a causal connection is clear and persuasive: "Taken to its extreme, [the argument that no causal relationship is necessary] would lead to the conclusion that any harmful act, if it were advertised in some way, would fall under the grant of coverage merely because it was advertised. Under this rationale, for instance, injury due to a defective product which is sold as a result of advertising activity and which later harms a consumer may fall within the coverage grant. The definition of 'advertising' is quite broad and may encompass a great deal of activity. Thus, a great many acts may fall within the ambit of advertising, extending advertising injury coverage far beyond the reasonable expectations of the insured." (*National Union Fire Ins. Co.* v. *Siliconix Inc., supra,* 729 F.Supp. at p. 80, fn. omitted.)

Under this rule, it has been held that a claim of patent infringement does not "occur[] in the course of . . . advertising activities" within the meaning of the policy even though the insured advertises the infringing product, if the claim of infringement is based on the sale or importation of the product rather than its advertisement. (*National Union Fire Ins. Co.* v. *Siliconix Inc., supra,* 729 F.Supp. at p. 80 [sale]; *Meyers & Sons Corp.* v. *Zurich American Ins., supra,* 545 N.E.2d at pp. 1208-1209 [importation].) Similarly, there is no coverage for a bank's failure to provide an advertised service in a proper manner. (*First Bank & Trust Co.* v. *N.H. Ins. Group, supra,* 469 A.2d at p. 1368.)

The single published opinion that the Bank cites as direct authority[8] to the contrary does not actually support the Bank's position. (*John Deere Ins. Co.* v. *Shamrock Industries, Inc.* (D.Minn. 1988) 696 F.Supp. 434, affd. on other grounds (8th Cir. 1991) 929 F.2d 413 (*John Deere*).) The insured in *John Deere* started a business in competition with his former employer. The employer filed suit, alleging that the employee's product infringed the employer's patents and constituted a misuse of its trade secrets. The employee tendered the claim to his CGL insurer, who refused to defend and sued for declaratory relief.

One of the issues before the court was whether the alleged instances of patent infringement and misuse of trade secrets had "occurred in the course

---

[8]The Bank cites several cases that use or discuss the terms "advertising" and "in the course of" in other contexts. (E.g., *Committee on Children's Television, Inc.* v. *General Foods Corp., supra,* 35 Cal.3d 197, 210 [concerning statutory prohibitions against false "advertising"]; *West American Ins. Co.* v. *California Mutual Ins. Co.* (1987) 195 Cal.App.3d 314, 319-323 [240 Cal.Rptr. 540] [concerning the requirement that injury must occur "in the course of" employment for workers' compensation insurance purposes].) These cases offer little help to a court interpreting a CGL policy.

of [the employee's] advertising activities" within the meaning of a CGL policy. (*John Deere, supra,* 696 F.Supp. at pp. 435-440.) The insurer argued that it was the sale of the infringing product, rather than the employee's representations to potential purchasers, that constituted infringement and misuse of trade secrets. In opposition, the employee argued that the policy did not require a causal relationship between "advertising activities" and the alleged harm. The court did not resolve the issue. Instead, the court disposed of the case on the principle that claims "need only arguably fall within the coverage of the policies" to give rise to a duty to defend. (*Id.,* at p. 440.) This limited disposition is of no assistance to a court deciding a coverage dispute.

We believe that the apparent majority rule, under which "advertising injury" must have a causal connection with "advertising activities," best articulates the insured's objectively reasonable expectations about the scope of coverage. This conclusion is partly a matter of interpretation and partly a matter of common sense.

As a matter of interpretation, the context of the CGL policy strongly indicates the requirement of a causal connection. The other types of "advertising injury" enumerated in the policy often do have a causal connection with advertising. "Defamation," whether libel or slander, occurs upon publication. (See Civ. Code, §§ 45, 46.) "Violation of right of privacy," in the advertising context, is virtually synonymous with unwanted publicity. (See, e.g., Civ. Code, § 3344.) "Infringement of copyright, title or slogan" typically occurs upon unauthorized reproduction or distribution of the protected material. (See 17 U.S.C. § 106.) Reading the term "unfair competition" in this context, an objectively reasonable insured would not conclude that the term "unfair competition" could refer to claims that bore no casual relationship to its advertising activities.

Moreover, as a matter of common sense, an objectively reasonable insured would not expect "advertising injury" coverage to extend as far as the Bank argues it should extend. Virtually every business that sells a product or service advertises, if only in the sense of making representations to potential customers.[9] If no causal relationship were required between "advertising activities" and "advertising injuries," then "advertising injury" coverage,

---

[9]Although we need not address the issue, we note that courts have disagreed on the question of what constitutes "advertising" for these purposes. Most of the published opinions hold that "advertising" means widespread promotional activities directed to the public at large. (*International Ins.* v. *Florists' Mut. Ins.* (1990) 201 Ill.App.3d 428 [147 Ill.Dec. 7, 559 N.E.2d 7, 9-10]; *Playboy Enterprises* v. *St. Paul Fire & Marine Ins.* (7th Cir. 1985) 769 F.2d

alone, would encompass most claims related to the insured's business. However, insureds generally expect to obtain such broad coverage, if at all, only by purchasing several forms of insurance, including coverage for "errors and omissions liability," "directors and officers liability," "completed operations and products liability," and/or other coverages available as part of a CGL policy. (See, e.g., 3 Cal. Insurance Law (Matthew Bender 1990) pp. 43-55 et seq., 47-36 et seq., 49-80 et seq. [examples of policy forms for various coverages].)

For these reasons, we hold that "advertising injury" must have a causal connection with the insured's "advertising activities" before there can be coverage. Applying this rule to the case before us, it is evident that the *Fallat* plaintiffs' claims were not so connected with the Bank's advertising activities. The only claims in the Fallat complaint that might be described as claims for "unfair competition," and which survived summary adjudication, were claims for the restoration of amounts allegedly acquired through violations of the Unfair Business Practices Act. (§ 17203.) These claims, which were based on the inadequacy of disclosures to consumers and the illegality of the terms of the loans, do not have a sufficient causal connection with advertisements directed solely to insurance agents.

Arguing against this conclusion, the Bank observes that its "advertising activities" included the payment of referral fees to insurance agents and that such fees, as the federal court found, gave the insurance agents an incentive to "sell" the Bank's loans without first making the disclosures required by federal law.[10] This contention, however, merely restates the argument that harm caused by a defective product or service is "advertising injury" simply because the product or service was incorrectly described. As already discussed, this argument has been rejected as an unreasonable extension of coverage. (See *National Union Fire Ins. Co.* v. *Siliconix Inc., supra,* 729 F.Supp. at p. 80.)

We thus conclude, as did the superior court, that the acts underlying the Fallat plaintiffs' claims did not occur in the course of the Bank's advertising activities within the meaning of the CGL policy.

425, 428-429; *Fox Chemical Co., Inc.* v. *Great Am. Ins.* Co. (Minn. 1978) 264 N.W.2d 385, 386; cf. *First Bank & Trust Co.* v. *N.H. Ins. Group, supra,* 469 A.2d at p. 1368.)

Of the published opinions, only the courts in *American States Insurance Co.* v. *Canyon Creek, supra,* 786 F.Supp. 821, 828, and *John Deere, supra,* 696 F.Supp. 434, 440, appear to have held that the term "advertising" can also encompass personal solicitations.

[10]The Bank also argues that the loan application itself, which incorrectly disclosed the interest rate and other charges, can be viewed as a form of direct advertising to consumers. However, it was this document that, in many cases, was signed by the insurance agent rather than the customer pursuant to a power of attorney. As the federal court found, it was the Bank's practice to send the application to the consumer only after it had been accepted by the Bank and, thus, become the actual loan agreement. (See *ante,* pp. 1258-1259.)

## DISPOSITION

The judgment of the Court of Appeal is reversed.

Lucas, C. J., Arabian, J., Baxter, J., and George, J., concurred.

**MOSK, J.**—I concur in the majority opinion insofar as it holds that disgorgement of sums obtained in violation of section 17203 of the Business and Professions Code is not "damages" for "advertising injury" caused by "unfair competition" under the policy. In my view, the opinion should conclude with the statement of this principle and its application to the facts of the case.

Discussion of the second point made by the majority, that there must be a causal connection between "advertising injury" and "advertising activities," and that such a connection was not established, is entirely unnecessary to the opinion. I express no view as to its validity.

Kennard, J., concurred.