Attached are first modification order (6/23/14) and unmodified version of opinion (6/5/14)

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THOSE INTERESTED UNDERWRITERS AT LLOYD'S LONDON SUBSCRIBING TO POLICY NO. WA901130E, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> TRANSGUARD INSURANCE COMPANY OF AMERICA; LA PACKING, CRATING AND TRANSPORT, <br><br> Defendants and Appellants. | B240843 <br><br> (Los Angeles County Super. Ct. No. BC398976) <br><br> ORDER MODIFYING OPINION  [NO CHANGE IN JUDGMENT] |

THE COURT:[*]

It is ordered that the opinion filed herein on June 5, 2014, be modified as follows:

On page one, replace the counsel listing as follows:

---

[*]     BOREN, P. J ., CHAVEZ, J., FERNS, J.†

†     Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Nemecek & Cole, Gregg S. Garfinkel and Susan S. Baker for Defendant and Appellant, Transguard Insurance Company.

Sheppard Mullin Richter & Hampton, LLP and Andre J. Cronthall for Defendant and Appellant, LA Packing Crating and Transport.

Smith & Hall, LLP and Eric B. Strongin for Plaintiff and Respondent.

This modification does not change the judgment.

Respondent's additional request for a substitution of counsel listing is denied.

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THOSE INTERESTED UNDERWRITERS AT LLOYD'S LONDON SUBSCRIBING TO POLICY NO. WA901130E,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>TRANSGUARD INSURANCE COMPANY OF AMERICA; LA PACKING, CRATING AND TRANSPORT,<br><br>        Defendants and Appellants. | B240843<br><br>(Los Angeles County<br>Super. Ct. No. BC398976)<br><br>ORDER MODIFYING OPINION<br> [NO CHANGE IN JUDGMENT] |

THE COURT:*

It is ordered that the opinion filed herein on June 5, 2014, be modified as follows:

On page one, replace the counsel listing as follows:

---

\* BOREN, P. J ., CHAVEZ, J., FERNS, J.†

† Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Nemecek & Cole, Gregg S. Garfinkel and Susan S. Baker for Defendant and Appellant, Transguard Insurance Company.

Sheppard Mullin Richter & Hampton, LLP and Andre J. Cronthall for Defendant and Appellant, LA Packing Crating and Transport.

Selman Breitman LLP and Eric B. Strongin for Plaintiff and Respondent.

This modification does not change the judgment.

Respondent's additional request for a substitution of counsel listing is denied.

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THOSE INTERESTED UNDERWRITERS AT LLOYD'S LONDON SUBSCRIBING TO POLICY NO. WA901130E,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>TRANSGUARD INSURANCE COMPANY OF AMERICA; LA PACKING, CRATING AND TRANSPORT,<br><br>        Defendant and Appellant. | B240843<br><br>(Los Angeles County<br>Super. Ct. No. BC398976) |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Mary H. Strobel, Judge.  Affirmed.

Nemecek & Cole, Gregg S. Garfinkel and Susan S. Baker, for Defendant and Appellant.

Sheppard Mullin Richter & Hampton, LLP, Andre J. Cronthall, Selman Breitman LLP and Eric B. Strongin for Plaintiff and Respondent.

* * * * * *

Plaintiff and respondent Those Interested Underwriters at Lloyd's London Subscribing to Policy No. WA901130E (Underwriters) brought a declaratory relief action against defendant and appellant Transguard Insurance Company of America (appellant) and defendant and respondent L.A. Packing, Crating and Transport (LAP). Both Underwriters and appellant provided insurance policies to LAP, and Underwriters sought a determination of the duty to defend an action brought against LAP after it was hired to install several paintings and one of its employees erroneously removed the painted frames from three paintings. Following a bench trial, the trial court ruled Underwriters did not owe a duty to defend and appellant owed a duty to defend.

We affirm. The trial court properly construed the policy issued by Underwriters as limited to damage involving goods in the due course of transit, and substantial evidence established that the alleged damage did not involve goods in transit. The trial court likewise properly construed the policy issued by appellant to provide coverage for the damage alleged, and substantial evidence supported the trial court's determination that appellant failed to meet its burden to show any policy exclusions applied.

## FACTUAL AND PROCEDURAL BACKGROUND

### *The Hollanders' Art Purchase and Installation.*

LAP is a fine art handling company that packs, crates, ships, stores, delivers and installs fine art. In October 2004, art collectors Stanley and Gail Hollander (the Hollanders) purchased three paintings by Martin Kippenberger (Kippenberger paintings) from a London gallery. In April 2005, they hired LAP to pick up and store several works of art, including the Kippenberger paintings. On May 9, 2005, the Hollanders requested that LAP deliver the Kippenberger paintings to their temporary home in Santa Monica. LAP delivered, unwrapped and installed the Kippenberger paintings on May 13, 2005, and the Hollanders' housekeeper signed a bill of lading accepting the delivery—an act the Hollanders had authorized.

Several months later, the Hollanders themselves removed the Kippenberger paintings from the walls, wrapped them, packed them in their car, drove them to their home in Mandeville Canyon and placed them inside the home. In December 2005, the

2

Hollanders hired LAP to hang approximately 40 works of art, including the Kippenberger paintings.[1]  The Hollanders marked the area where they wanted the Kippenberger paintings hung and informed an LAP supervisor of the desired location; they did not give LAP any further instructions regarding those works.  During the installation and while the Hollanders were away from their home at lunch, LAP employee Bryce Bowman accidentally tore off the Kippenberger paintings' cardboard frames that were a part of the artwork, mistaking them for protective covering.  Bowman was not working with anyone else when the damage occurred.

### *LAP's Insurance and Tender of the Hollander Action.*

In January 2007, the Hollanders filed a complaint against LAP for negligence and against their own homeowners' insurer for breach of contract and breach of the implied covenant of good faith and fair dealing (Hollander action).  LAP, in turn, notified its insurers of the Hollander action in March and April 2007.

At the time of the incident giving rise to the Hollander action, LAP was insured by appellant under a commercial liability package (appellant's policy) that included three components—a marine movers policy, an automobile policy and a commercial general liability policy.  Each policy contained its own exclusions, and only the marine movers, or cargo, policy expressly excluded coverage for fine art.  The general liability portion of appellant's policy provided that appellant would "pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies.  We will have the right and duty to defend the insured against any 'suit' seeking those damages.  However, we will have no duty to defend the insured against any suit seeking damages for 'bodily injury' or 'property damage' to which this insurance does not apply."  Among other exclusions, appellant's policy excluded "'property damage' to: . . . [¶¶] [p]ersonal property in the care, custody or control of the insured," and to "[t]hat particular part of any property that must be restored, repaired or replaced because 'your work' was incorrectly performed on it."

---

[1]  The Hollanders' other pieces were in storage, and LAP delivered and installed them over a several-day period.  Only the Kippenberger paintings were already in the home before LAP commenced their installation.

LAP was also insured by Underwriters under a fine art packers and shippers policy (the Underwriters policy), which covered LAP's liability for "all risks of physical loss of or damage to lawful goods and merchandise, including legal defense costs, the property of others, shipped &/or stored under bills of lading, shipping receipts, or delivery receipts issued by [LAP], not exceeding the amount detailed in the Certificate attached hereto while such goods and merchandise are in the custody of [LAP], or in the custody of connecting carriers, whilst in due course of transit within the territorial scope as detailed in the Certificate attached hereto." In connection with LAP's 2008 renewal of the Underwriters policy, the coverage was expanded to include installation exposure for an increased premium.

Appellant initially assumed LAP's defense of the Hollander action, subject to a reservation of rights. Shortly thereafter, Underwriters also agreed to defend LAP subject to a full reservation of rights. In May 2007, however, appellant issued a denial of coverage and informed LAP that it would be withdrawing its defense of the Hollander action. It reasoned that the allegations in the Hollander action fell within the exclusions for "care, custody and control of the insured" and for "your work."

***Pleadings and Motions.***

In September 2008, Underwriters filed a complaint for declaratory relief, equitable contribution and subrogation against appellant and LAP. It sought a declaration that it owed no duty to defend the Hollander action, that appellant owed a duty to defend and that appellant owed it all or a portion of any amounts it had incurred in defending. Appellant answered, generally denying the allegations and asserting multiple affirmative defenses.

In August 2009, Underwriters moved for summary judgment and alternatively for summary adjudication. Appellant opposed the motion, though LAP did not. In a January 2010 order, the trial court denied the motion, finding that Underwriters failed to meet its burden to show, as a matter of law, either that its policy did not provide coverage for LAP's actions or that appellant's policy's exclusions did not apply.

***Trial and Judgment.***

4

The trial court bifurcated the trial so that the first two causes of action for declaratory relief were tried first, and the latter two causes of action for equitable contribution and subrogation were tried second. The first phase of the bench trial commenced in September 2010. The parties stipulated to a number of facts. In addition, Underwriters called as witnesses its policy underwriter, appellant's Los Angeles office managing vice-president and one of appellant's senior claims adjusters, while appellant called LAP's owner and Stanley Hollander.

Following closing arguments, the trial court announced its ruling in favor of Underwriters on the declaratory relief causes of action and subsequently entered an order in November 2010 outlining its reasoning. In connection with the first cause of action, the trial court ruled that the Underwriters policy did not cover the Hollander action because the activity in question involved installation that was not incidental to the shipping or storage of the Kippenberger paintings. On the second cause of action, the trial ruled that appellant owed LAP a duty to defend the Hollander action. It rejected appellant's argument that its policy excluded the claimed loss, finding the evidence showed that LAP did not have exclusive care, custody or control of the Kippenberger paintings at the time of installation. The trial court further found that the "your work" exclusion did not apply, noting that appellant presented neither evidence nor argument regarding the applicability of the exclusion. It expressly noted that any conclusions that differed from its order denying summary judgment were based on further legal analysis as well as consideration of the evidence offered at trial.

The second phase of the trial on the equitable contribution and subrogation causes of action also took place in September 2011. The trial court again ruled in favor of Underwriters and ordered appellant to pay a principal sum of $907,004.74, plus $83,834.05 in prejudgment interest and $39,059.99 in costs, for a total amount of $1,029.889.78.

Judgment was entered in January 2012. The trial court thereafter denied appellant's motions for a new trial and judgment notwithstanding the verdict. Appellant appealed from the judgment.

DISCUSSION

Appellant's challenges on appeal are limited to the first phase of the trial.  It argues there was no substantial evidence to support the trial court's determination that the Underwriters policy did not provide coverage and that its own policy did not exclude the loss.  We find no merit to its position.

## I.  Insurance Policy Interpretation and Standard of Review.

In general, interpretation of an insurance policy is a question of law that we review de novo under settled rules of contract interpretation.  (*Ameron Internat. Corp. v. Insurance Co. of State of Pennsylvania* (2010) 50 Cal.4th 1370, 1377; *Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1264.)  The Court in *Palmer v. Truck Ins. Exchange* (1999) 21 Cal.4th 1109, 1115, summarized those rules:  "'While insurance contracts have special features, they are still contracts to which the ordinary rules of contractual interpretation apply.' [Citation.]  Thus, 'the mutual intention of the parties at the time the contract is formed governs interpretation.' [Citation.]  If possible, we infer this intent solely from the written provisions of the insurance policy. [Citation.]  If the policy language 'is clear and explicit, it governs.' [Citation.]  [¶] When interpreting a policy provision, we must give its terms their '"ordinary and popular sense," unless "used by the parties in a technical sense or a special meaning is given to them by usage."' [Citation.]  We must also interpret these terms 'in context' [citation], and give effect 'to every part' of the policy with 'each clause helping to interpret the other.' [Citations.]"

"On the other hand, '[i]f the terms of a promise are in any respect ambiguous or uncertain, it must be interpreted in the sense in which the promisor believed, at the time of making it, that the promisee understood it.' [Citations.]  This rule, as applied to a promise of coverage in an insurance policy, protects not the subjective beliefs of the insurer but, rather, 'the objectively reasonable expectations of the insured.' [Citation.]  Only if this rule does not resolve the ambiguity do we then resolve it against the insurer.  [Citation.]" (*Bank of the West v. Superior Court, supra*, 2 Cal.4th at pp. 1264-1265.)  "In determining whether an ambiguity exists, the words of the policy must be interpreted according to the plain meaning that a layperson would ordinarily attach to them.

6

(*Reserve Insurance Co. v. Pisciotta* (1982) 30 Cal.3d 800, 807.)  Policy language is ambiguous when it reasonably may be interpreted in two or more ways.  (*Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 18.)  'Courts will not adopt a strained or absurd interpretation in order to create an ambiguity where none exists.'  (*Reserve Insurance Co. v. Pisciotta,* [*supra,*] at p. 807.)  Moreover, the language must be interpreted in the context of the policy as a whole, and in light of the circumstances of the case.  It cannot be deemed to be ambiguous in the abstract.  (*Bank of the West v. Superior Court, supra*, 2 Cal.4th at p. 1265.)"  (*Mercury Ins. Co. v. Pearson* (2008) 169 Cal.App.4th 1064, 1070, italics omitted.)

"Contract interpretation, including the resolution of any ambiguity, is solely a judicial function, unless the interpretation turns on the credibility of extrinsic evidence.  [Citation.]"  (*Legacy Vulcan Corp. v. Superior Court* (2010) 185 Cal.App.4th 677, 688.)  "When the trial court has resolved a disputed factual issue, [we] review the ruling according to the substantial evidence rule.  If the trial court's resolution of the factual issue is supported by substantial evidence, it must be affirmed."  (*Winograd v. American Broadcasting Co.* (1998) 68 Cal.App.4th 624, 632.)  Correspondingly, when the dispositive issue is the application of an insurance policy, rather than its interpretation, and different inferences may reasonably be drawn from the evidence, the trial court's findings remain subject to substantial evidence review.  (*Id*. at pp. 632-634; accord, *Alpine Ins. Co. v. Planchon* (1999) 72 Cal.App.4th 1316, 1324.)

## II.      The Trial Court Properly Determined the Underwriters Policy Did Not Provide Coverage.

In connection with the first cause of action, the trial court ruled that Underwriters owed no duty to defend or indemnify because the policy did not cover the liability alleged in the Hollander action.  It relied on the stipulated facts, testimony and exhibits showing that LAP picked up and stored the Kippenberger paintings in April 2005 and delivered them to the Hollanders pursuant to a bill of lading in May 2005; several months later the Hollanders wrapped and moved the paintings themselves to another home; and LAP damaged the paintings during the process of installation at the new home.  The trial

7

court reasoned that such damage was outside the scope of the Underwriters policy, which provided coverage for damage to goods "shipped &/or stored under bills of lading, shipping receipts, or delivery receipts issued by [LAP], . . . while such goods and merchandise are in the custody of [LAP], or in the custody of connecting carriers, whilst in due course of transit . . . ." According to the trial court, "[o]n the face of the policy, the paintings were not being shipped or stored at the time of the damage."

Beyond evaluating the face of the policy, the trial court considered extrinsic evidence to the extent the policy could be considered ambiguous as to when shipping or transit ends. It expressly considered the testimony of Underwriters' representative Graham Hawkins, who explained that covered shipping or transit ends when goods are delivered pursuant and accepted pursuant to a receipt, and the testimony of LAP owner Jim Isenson, who stated that his interpretation of "transit" was the same and confirmed that LAP did not deliver or otherwise transport the Kippenberger paintings to the home where they were installed. On the basis of that evidence, the trial court ruled: "[T]he L.A. Packing activity on the date in question with respect to the Kippenbergers was strictly installation of the Kippenbergers, as the Hollanders themselves had wrapped and transported them to their own home. The court finds the Kippenberger paintings were not damaged while being stored or being shipped or in the course of transit at the time of the damage. [¶] Shipping of the Kippenberger paintings was complete when the Hollanders accepted delivery at their Santa Monica home and the housekeeper signed the receipt. [¶] The Underwriters policy does not cover installation which is not incidental to shipping or storage."

We find no basis to disturb the trial court's conclusion. The Underwriters policy unambiguously provided coverage for damage to goods shipped or stored pursuant to a receipt and while in the due course of transit. (See generally *Reserve Insurance Co. v. Pisciotta, supra*, 30 Cal.3d at p. 807 ["Words used in an insurance policy are to be interpreted according to the plain meaning which a layman would ordinarily attach to them," and we must "not adopt a strained or absurd interpretation" of the policy language].) While the term "transit" does not necessarily mean continuous movement,

8

the word does contemplate some type of transportation.  (See *Aetna Casualty and Surety Co. v. Burbank Generators, Inc.* (1981) 121 Cal.App.3d 813, 816.)  There, the court construed similar language to extend coverage when the goods, "even though temporarily at rest, were still on their way and whe[n] the stop, where the loss occurred, was merely incidental to the main purpose of delivery."  (*Ibid.*)

The court in *Cargo Master, Inc. v. Ace USA Ins. Co.* (Tenn.Ct.App. 2007) 2007 WL 121429 engaged in a comprehensive analysis of the phrase "in due course of transit" for the purposes of insurance coverage.  It took into account Black's Law Dictionary's definition of "transit" as "'on the way or passage; while passing from one person or place to another; in the course of transportation,'" and its more specific definition providing that "'[w]ithin [a] policy covering goods in transit, [the] term has significance of activity and of motion and direction; literally it means in [the course] of passing from point to point, and ordinarily goods in transit would imply that goods will lawfully be picked up at given place and hauled to place designated by owner or one with authority to so designate.'" [Citations.]"  (*Id.*, 2007 WL 121429 at *5, fn. 5.)  In addition, the court surveyed multiple jurisdictions and synthesized the interpretation to be gleaned from those cases, finding "that the common and ordinary meaning of the terms 'in transit' or 'in due course of transit,' while limited to cargo that is actually en route from one place to the next, contemplates temporary stops which are incidental to the course of transportation.  Whether an interruption in the actual movement of the cargo is incidental to the course of transportation depends upon the purpose and extent of the stop."  (*Id.*, 2007 WL 121429 at *7.)  Consistent with this authority, the trial court properly construed the Underwriters policy as limited to activity that was incidental to shipping or storage.

Substantial evidence supported the trial court's determination that LAP's installation of the Kippenberger paintings was not incidental to transportation of the works.  According to the stipulated facts, LAP transported the Kippenberger paintings to the Hollanders' home in Santa Monica in May 2005, and the Hollanders, through their housekeeper, signed a bill of lading accepting their delivery.  Underwriters offered no evidence to suggest that the Santa Monica home was a temporary stop during the course

of transit, or to show that LAP contemplated any further transportation of the Kippenberger paintings. Instead, the evidence showed that the Hollanders themselves wrapped the Kippenberger paintings and transported them to another home in Mandeville Canyon. The Hollanders retained LAP to hang or install the Kippenbergers paintings, and their claims against LAP stemmed only from the damage that occurred during installation. Because there was no evidence to show the damage occurred while the Kippenberger paintings were in the due course of transit, the Underwriters policy did not afford coverage.

In challenging this conclusion, appellant essentially ignores the Underwriters policy language and proceeds directly to assert that a finding of coverage should be premised on LAP's reasonable expectations. Preliminarily, we observe that the insured's reasonable expectations come into play when it is necessary to resolve an ambiguous policy term. (E.g., *Kazi v. State Farm Fire and Casualty Co.* (2001) 24 Cal.4th 871, 879; *Buss v. Superior Court* (1997) 16 Cal.4th 35, 45.) Because the policy language limiting coverage to damage to goods "in due course of transit" was unambiguous, we need not examine LAP's reasonable expectations of coverage.

But even if we were to find some ambiguity, we would find insufficient evidence to show a reasonable expectation of coverage. Though appellant cites to testimony from LAP's owner Isenson that he believed the Underwriters policy would cover LAP's fine arts' handling and initially tendered the Hollander action to Underwriters, it ignores Isenson's testimony that he understood the Underwriters policy covered liability for shipping and storage, he was aware that LAP completed its task of transportation once the artwork had been delivered and a bill of lading was signed, and he had no expectations beyond the language of the Underwriters policy itself, as well as his testimony that he had previously relied on appellant's policy to cover a claim involving damage that occurred during installation  Appellant likewise ignores deposition testimony from insurance broker David Genser that he never recalled discussing with Isenson whether LAP would be covered for damage to artwork that LAP had neither transported nor stored. Nor does it cite testimony from policy underwriter Graham

10

Hawkins, who stated that Isenson inquired about coverage for installation for the first time in 2008, well after the Hollander action had been filed. "An appellant who fails to cite and discuss the evidence supporting the judgment cannot demonstrate that such evidence is insufficient." (*Rayii v. Gatica* (2013) 218 Cal.App.4th 1402, 1408.) We find no basis to disturb the trial court's ruling on the first cause of action for declaratory relief.

**III.    The Trial Court Properly Determined that Appellant Owed a Duty to Defend.**

On the second cause of action, the trial court ruled appellant owed LAP a duty to defend in the Hollander action. It determined that appellant's general liability policy covered the damage alleged in the Hollander action unless appellant could establish a policy exclusion or exception applied. It further determined that the evidence did not support the application of either the "care, custody and control" exclusion or the "your work" exclusion. Again, we find no basis to disturb this conclusion.

*A.    The Care, Custody and Control Exclusion.*

Appellant's policy obligated appellant to defend and indemnify LAP for claims of "property damage," defined as "[p]hysical injury to tangible property, including all resulting loss of use of that property." While appellant does not challenge the finding that the damage claimed in the Hollander action constituted property damage, it asserts substantial evidence did not support the trial court's conclusion that such damage fell outside the policy's exclusion for property damage to"[p]ersonal property in the care, custody or control of the insured." (See *MRI Healthcare Center of Glendale, Inc. v. State Farm General Ins. Co.* (2010) 187 Cal.App.4th 766, 777 [once it is shown a claimed loss falls within the coverage provided by a policy's insuring clause, "the burden is on the insurer to prove the claim is specifically excluded"].)

The care, custody and control exclusion is intended "to except from policy coverage liability on account of damage to property held under bailment." (*Karpe v. Great American Indem. Co.* (1961) 190 Cal.App.2d 226, 230; see Croskey, Heeseman & Johnson, Cal. Practice Guide: Insurance Litigation (The Rutter Group 2013), ¶ 7:2370, p. 7J-27 [the care, custody or control exclusion "precludes coverage for property held by the insured under bailment"]; see also *Meyer Koulish Co. v. Cannon* (1963) 213 Cal.App.2d

11

419, 427 [describing a bailment as "'a delivery of personalty for some particular purpose, or on mere deposit, upon a contract, express or implied, that after the purpose has been fulfilled it shall be redelivered to the person who delivered it, or otherwise dealt with according to his directions, or kept until he reclaims it"].)

Though we would typically first determine whether the exclusion is unambiguous, the court in *Home Indem. Co. v. Leo L. Davis, Inc.* (1978) 79 Cal.App.3d 863, 871-872 (*Home Indem.*), explained the application of the exclusion is necessarily a fact-driven inquiry, stating: "[I]n varying factual situations the precise exclusion has been held both ambiguous and unambiguous. The only consistency in the cases is the need for painstaking evaluation of the specific facts of each case, especially those that bear on the nature and extent of the insured's control. [Citation.] While it is true that the weight of authority favors applying the exclusion [citation], the courts are not averse to holding it inapplicable where the control exercised by the insured—possessory or physical—is not exclusive and complete at the critical moment in question." (See Cal. Practice Guide: Insurance Litigation, *supra*, ¶ 7:2371, p. 7J-27 ["The [care, custody and control] exclusion does not apply where the insured's control is *not exclusive or complete* at the time of the occurrence giving rise to the injury or damage"].)

For example, in *Home Indem., supra,* 79 Cal.App.3d 863, the court held the care, custody and control exclusion did not apply to preclude coverage to a crane operator who had rented a crane and operator to construction companies for the purpose of dissembling a batch plant, and the plant sustained damage when the lifting of a pugmill caused a crane cable to break. (*Id.* at pp. 866-867, 872.) The court reasoned that at the time of the incident, the crane operator did not exclusively control the pugmill; at best, it had only momentary access in order to serve the contractors' purposes. (*Id.* at p. 872.) In a further example involving circumstances analogous to those here, the court in *Haerens v. Commercial Casualty Ins. Co.* (1955) 130 Cal.App.2d.Supp. 892, 893-894, held the care, custody and control exclusion did not apply where the insured was hired to paint a house and one of his employees negligently scratched a number of windows while sanding the

12

metal strips separating the windowpanes. The court determined windowpanes were never in the insured's care, custody or control. (*Ibid*.)

Substantial evidence supported the same conclusion here, as LAP's control of the Kippenberger paintings was neither exclusive nor complete. In finding that the Kippenberger paintings were not in LAP's care, custody or control, the trial court relied on evidence showing the artwork was in the Hollanders' home and intended to be installed in that home; the Hollanders were present in the home on the day of installation; and the Hollanders gave LAP instructions regarding their desired placement of the Kippenberger paintings. Under these circumstances, the trial court found the requirements of the exclusion were not satisfied: "[I]t is clear that it was not exclusive care, custody or control by L.A. Packing. The court looks to the question of care, custody or control at the time of the damages; however, this cannot be so narrowly construed as to mean in whose hands the paintings were at the exact time the frames were erroneously torn off. [¶] Rather, the court looks at where the paintings were located in the Hollanders' home, not in L.A. Packing storage or L.A. Packing arranged transit, and the fact that the installation was being done, at least to some measure, per the instruction of Mr. or Mrs. Hollander."

Appellant contends the evidence was insufficient to avoid the exclusion and maintains the trial court should have been guided by a comment in *Home Indem., supra,* 79 Cal.App.3d at page 871 that "[a]lmost invariably where coverage is denied, physical control by the insured has been exclusive, even if such exclusivity was only momentary, so long as the damage occurred in that moment." Asserting that LAP had exclusive— albeit momentary—control over the Kippenberger paintings at the time they were damaged, appellant relies on Bowman's deposition testimony that he did not seek advice from the Hollanders before removing the frames, he did not know the Hollanders' whereabouts when he began to remove the frames and no one else was in the room when he removed the frames. It also relies on Stanley Hollander's testimony that he was not present in the home at the moment the frames were removed. Appellant argues that this evidence mandated the application of the care, custody or control exclusion.

13

Appellant's argument that momentary exclusivity is key is premised on a misinterpretation of both the law and the facts. The comment in *Home Indem., supra*, 79 Cal.App.3d at page 871 regarding momentary exclusive physical control appears as part of a discussion about the factors on which other courts have relied to find the exclusion inapplicable. (*Id.* at pp. 869-872.) In the context of that discussion—primarily involving other crane cases—the court contrasted such exclusivity with several factors indicative of the absence of care, custody or control, including where "control was effectively retained in some fashion by the owner of the damaged property," "where physical control was shared by another with the insured" and where the damaged goods "were not in the insured's control, but instead he had merely been given temporary access thereto." (*Id.* at pp. 869, 871.) The trial court here determined that the evidence presented "a shared control situation." This was the same conclusion reached in *Home Indem., supra*, 79 Cal.App.3d at page 872, where the court affirmed the finding that the care, custody and control exclusion was inapplicable on the basis of evidence which showed the insured crane owner's "control of the pugmill was not exclusive at the time of the accident. The crane and its operator are best described as mere instrumentalities of [the construction company], with momentary access to the pugmill and the other parts of the batch plant in order to serve [the construction company's] purposes, at [the construction company's] direction, and under [the construction company's] control. The most that can be said with respect to the pugmill is that [the construction companies] temporarily shared with [the insured] their control of the pugmill insofar as necessary to lift that part."

Here, similarly, the evidence showed that LAP had access to the Kippenberger paintings in order to serve the Hollanders' purposes, it received instructions from the Hollanders regarding their placement and the paintings at all relevant times remained in the Hollanders' home. In light of this evidence, appellant's reliance on Bowman's testimony is misplaced. As aptly stated in *Howard v. Owens Corning* (1999) 72 Cal.App.4th 621, 631: "We emphasize that the test is *not* the presence or absence of a substantial conflict in the evidence. Rather, it is simply whether there is substantial evidence in favor of the respondent. If this 'substantial' evidence is present, no matter

14

how slight it may appear in comparison with the contradictory evidence, the judgment must be upheld.  As a general rule, therefore, we will look only at the evidence and reasonable inferences supporting the successful party, and disregard the contrary showing."  Substantial evidence supported the trial court's conclusion that the Kippenberger paintings were never in LAP's exclusive care, custody or control.  (*Haerens v. Commercial Cas. Ins. Co., supra,* 130 Cal.App.2d.Supp. at pp. 893-894.)

### B. The "Your Work" Exclusion.

Appellant further maintains substantial evidence did not support the trial court's determination that another exclusion, the "your work" exclusion, did not apply.  The exclusion applied to property damage to "[t]hat particular part of any property that must be restored, repaired or replaced because 'your work' was incorrectly performed on it."  Appellant's policy defined "your work" to mean "(1) Work or operations performed by you or on your behalf; and [¶] (2) Materials, parts or equipment furnished in connection with such work or operations."  The exclusion did not apply to property damage included within the "products completed operation hazard," which expressly excepted "[w]ork that has not yet been completed or abandoned."

The trial court ruled that appellant "presented no evidence or argument at trial concerning the applicability of the your-work exclusion, and the court considers this argument to have been withdrawn.  In any event, the court finds the exclusion inequitable."  Appellant bore the burden of establishing the exclusion was applicable.  (*Aydin Corp. v. First State Ins. Co.* (1998) 18 Cal.4th 1183, 1188.)  In asserting it satisfied its burden, appellant points to one page in its trial brief and generally refers to the testimony at trial.  But appellant never once mentioned the exclusion during closing argument, nor did it endeavor to show how any trial testimony supported its application.  "An insurer may rely on an exclusion to deny coverage only if it provides *conclusive evidence* demonstrating that the exclusion applies.  [Citations.]  Thus, an insurer that wishes to rely on an exclusion has the burden of proving, through conclusive evidence, that the exclusion applies in all possible worlds."  (*Atlantic Mutual Ins. Co. v. J. Lamb, Inc.* (2002) 100 Cal.App.4th 1017, 1039-1040 [claims adjuster's testimony did not rise to

15

the level of conclusive evidence].)  Though appellant argues it offered testimony regarding the general scope of LAP's work as evidence supporting application of the exclusion, it offered no evidence—let alone conclusive evidence—to show that frame removal was a part of that work.  Under these circumstances, substantial evidence supported the trial court's withdrawal finding.

In any event, even if we were to find that appellant had preserved the issue, we would find no basis to apply the exclusion.  The rationale underlying the your work exclusion is that "a liability insurance policy is not designed to serve as a performance bond [citation] or warranty of a contractor's product. [Citations.]"  (*F & H Construction v. ITT Hartford Ins. Co. of Midwest* (2004) 118 Cal.App.4th 364, 373; see Cal. Practice Guide:  Insurance Litigation, *supra*, ¶ 7:2351, p. 7J-21 ["The exclusion applies both to defective components in the insured's product and to nondefective components damaged by the defective components"].)  The court in *Maryland Casualty Co. Reeder* (1990) 221 Cal.App.3d 961, 967 explained that general liability policies containing such exclusions "are not designed to provide contractors and developers with coverage against claims their work is inferior or defective.  [Citation.] The risk of replacing and repairing defective materials or poor workmanship has generally been considered a commercial risk which is not passed on to the liability insurer.  [Citations.]  Rather liability coverage comes into play when the insured's defective materials or work cause injury to property other than the insured's own work or products."  Here, LAP's actions that resulted in damage to the Kippenberger paintings was not the type of defective work intended to be encompassed by the exclusion, and instead resulted in the type of injury that liability insurance is designed to cover.  Indeed, construing "your work" to include LAP's alleged conduct would essentially eviscerate any coverage under appellant's policy.

16

**DISPOSITION**

The judgment is affirmed.  Underwriters is entitled to its costs on appeal.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.

_____, J. *

FERNS

We concur:

_____, P. J.

BOREN

_____, J.

CHAVEZ

---

\* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

17