Filed 3/20/24; Certified for Publication 3/25/24 (order attached)

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| BROOKLYN RESTAURANTS, INC., <br><br> Plaintiff and Appellant, <br><br> v. <br><br> SENTINEL INSURANCE COMPANY, LTD., <br><br> Defendant and Respondent. | D081132 <br><br><br><br> (Super. Ct. No. 37-2020-00024865-CU-IC-CTL) |

APPEAL from a judgment of the Superior Court of San Diego County, Eddie C. Sturgeon, Judge. Reversed; remanded with directions.

LiMandri & Jonna, Charles S. LiMandri, Paul M. Jonna, and Milan L. Brandon II for Plaintiff and Appellant.

Steptoe & Johnson, Robyn C. Crowther, Melanie Atswei Ayerh; Wiggin and Dana, and Tadhg Dooley for Defendant and Respondent.

After its diner was partially shut down during the COVID-19 pandemic, Brooklyn Restaurants, Inc. (Brooklyn) brought suit against its insurer, Sentinel Insurance Company, Limited (Sentinel), when Sentinel declined a tender under a commercial property insurance policy. The

superior court granted Sentinel's motion for judgment on the pleadings, finding there was no coverage under the subject policy for Brooklyn's claimed business loss.

Brooklyn appeals the ensuing judgment of dismissal, arguing this case is different from the multitude of COVID-19 pandemic related insurance cases filed in this state. To this end, Brooklyn points out that it has alleged a direct physical loss, which triggers coverage under the policy. Moreover, it emphasizes that the subject insurance policy contains a unique provision, specifically covering losses attributable to a virus. As such, Brooklyn insists, under that distinctive provision, physical loss includes simply cleaning an area infected by the coronavirus. We agree that the subject policy is reasonably susceptible to that interpretation. And Brooklyn has pled that the coronavirus was present at its premises, and it engaged in sanitization efforts to remove the virus and remain, at least, partially open. Consequently, this is one of those rare cases where we conclude an insured has adequately alleged a direct physical loss or damage under the subject policy, at least raising the specter of coverage under that policy.

Yet, the subject policy includes certain exclusions and conditions that are applicable to coverage for a loss or damage stemming from a virus. Brooklyn, however, argues that these exclusions and conditions render the subject policy illusory. Because the instant matter is only at the pleading stage, we agree that Brooklyn has done enough to raise the issue that its policy is illusory, which in turn raises factual questions that require discovery and the marshalling of evidence. Accordingly, we reverse the judgment and remand this matter back to the superior court with instructions to enter an order denying Sentinel's motion for judgment on the pleadings.

## FACTUAL AND PROCEDURAL BACKGROUND

Brooklyn "operates an iconic local diner and longstanding community gathering place known as 'Harry's Coffee Shop'. " Harry's Coffee Shop is located in La Jolla, California, in "a heavily trafficked pedestrian thoroughfare that invites visitors to linger, dine, shop, and socialize." In addition, Harry's Coffee Shop benefits from regional theme parks and other facilities that attract visitors to the area.

In August 2019, Brooklyn renewed its commercial property policy with Sentinel. The policy was a Spectrum Business Owner's Policy No. 72 SBA BB7110 SC (the Policy), which provided coverage for Harry's Coffee Shop from August 1, 2019 to August 1, 2020.

The Policy, consisting of 196 pages, includes provisions Brooklyn argues are relevant here. For example, the Special Property Coverage Form states that Sentinel "will pay for direct physical loss of or physical damages to Covered Property at the premises . . . caused by or resulting from a Covered Cause of Loss." The Policy further defines a "Covered Causes of Loss" as "risks of direct physical loss," except where otherwise excluded or limited.

The Policy also includes an endorsement for "Limited Fungi, Bacteria, or Virus Coverage" (the Virus Endorsement). That endorsement contains provisions that (1) add limited coverage in certain circumstances for "loss or damage" "caused by" "virus," subject to certain conditions requiring that the virus was the "result of" one or more of a list of enumerated causes, and (2) exclude any "loss or damage caused directly or indirectly by" the "[p]resence, growth, proliferation, spread or any activity of 'fungi', wet rot, dry rot, bacteria or virus," subject to an exception where the loss or damage falls within the limited coverage provided under the Virus Endorsement.

Additionally, the Policy provides Business Income coverage for losses caused by direct physical loss or damage at dependent properties "caused by or resulting from a Covered Cause of Loss." Further, the Policy defines a dependent property as "property owned, leased or operated by others whom [Brooklyn] depend[ed] on to: [¶] (a) Deliver materials or services to [Brooklyn] or to others for [Brooklyn's] account. But services do not include: [¶] (i) Water, communication, power services or any other utility services; or [¶] (ii) Any type of web site, or Internet service. [¶] (b) Accept [Brooklyn's] products or services; [¶] (c) Manufacture [Brooklyn's] products for delivery to [Brooklyn's] customers under contract for sale; or [¶] (d) Attract customers to [Brooklyn's] business premises."

In March 2020, Brooklyn submitted a claim under the Policy "for loss of business income due to the community spread and infection of coronavirus at [Harry's Coffee Shop], and the civil response thereto."[1] Sentinel denied the claim. Brooklyn then filed suit.

In the first amended complaint, Brooklyn alleged that, beginning in March 2020, a series of government stay-at-home orders[2] issued in response to the coronavirus as well as "community infection of COVID-19 adjacent to

---

[1]     The actual claim does not appear to be in the record.

[2]     These orders included: (1) Executive Order N-45-20 that declared a state of emergency in response to expected impacts arising from the COVID-19 pandemic; (2) Executive Order N-33-20 that ordered all individuals living in California to stay home or at their place of residence subject to certain exceptions; (3) an order from the public health officer of San Diego County wherein all individuals living in San Diego County were to stay at home except that they may leave to provide or receive certain essential services or to engage in certain essential activities; and (4) a reclosure order that closed indoor dining at restaurants for an additional three weeks in July 2020.

4

[Harry's Coffee Shop], have caused a precipitous decline in [Brooklyn's] business income." Although acknowledging that restaurants and food services were deemed "Essential Critical Infrastructure," exempting them from governmental orders, Brooklyn alleged that, in response to an executive order issued by California's governor, it was "forced to prohibit on-site dining, severely limiting the number of customers that [it] could service and effectuating a disastrous evaporation of [its] business income."

Brooklyn also averred that "[b]eginning in March 2020, local and state governments across the country urged their citizens to act as if they were infected and as if everyone around them was infected with a novel and highly infectious coronavirus." As such, Brooklyn claimed Harry's Coffee Shop was, "and continue[d] to be, repeatedly infected by individuals coming and going from the premises until the virus is eliminated in the region."

Brooklyn further alleged that the United States federal government issued travel bans, prohibiting "foreign nationals" from several countries from entering the United States. It also noted that, "[b]ecause of the presence of COVID-19, which was continually and repeatedly brought to . . . [Harry's Coffee Shop] by employees and guests, [Brooklyn] was forced to reduce operations and move outside, physically losing the use of its interior dining spaces."

In addition, Brooklyn represented that "[i]n or about the early weeks of March 2020, the government, scientific community, and those personally affected by the virus recognized the coronavirus as a cause of real physical loss and damage." Moreover, Brooklyn claimed the coronavirus pandemic was "exacerbated by the fact that the deadly coronavirus physically infects and stays on the surfaces of objects or materials for many days. The virus was also carried into this state by individuals traveling between countries

5

and states who in turn infected others and the facilities they visited, infecting property in and around . . . [Harry's Coffee Shop]."  (Footnote omitted.)

The operative complaint included allegations regarding the impact of the coronavirus pandemic on Harry's Coffee Shop.  To this end, Brooklyn averred that "[t]he presence of COVID-19 also required [Brooklyn] to operate at reduced capacity and deprived [Brooklyn] of the ability to use the dining rooms and other facilities at . . . [Harry's Coffee Shop].  Moreover, the repeated movement of equipment, tables, and other furniture in and out of the building in order to respond to the presence of the virus resulted in physical damage to that equipment, including broken chairs and at least one broken table."  And Brooklyn alleged that it was required to incur "significant Extra Expense through enhanced and continual sanitation of . . . [Harry's Coffee Shop] in order to help mitigate the impacts of business interruption and continue operations in some decreased capacity."

The operative complaint contained causes of action for breach of contract, breach of the implied covenant of good faith and fair dealing, declaratory relief, and professional negligence.  These causes of action were based on Sentinel's denial of Brooklyn's claim under the Policy.

Sentinel filed a motion for judgment on the pleadings.  Brooklyn opposed that motion, to which, Sentinel filed a reply.  The superior court granted the motion, finding that there was no coverage under the Policy for Brooklyn's claims.  The court subsequently entered judgment in favor of Sentinel, dismissing the operative complaint with prejudice.  Brooklyn timely appealed.

6

DISCUSSION

A. Standard of Review and Relevant Law

" 'The standard of review for a motion for judgment on the pleadings is the same as that for a general demurrer: We treat the pleadings as admitting all of the material facts properly pleaded, but not any contentions, deductions or conclusions of fact or law contained therein. . . . We review the complaint de novo to determine whether it alleges facts sufficient to state a cause of action under any theory.' " (*Burd v. Barkley Court Reporters, Inc.* (2017) 17 Cal.App.5th 1037, 1042.) "Denial of leave to amend after granting a motion for judgment on the pleadings is reviewed for abuse of discretion." (*Ott v. Alfa-Laval Agri, Inc.* (1995) 31 Cal.App.4th 1439, 1448.)

This appeal requires us to interpret an insurance policy. "The principles governing the interpretation of insurance policies in California are well settled. 'Our goal in construing insurance contracts, as with contracts generally, is to give effect to the parties' mutual intentions. (*Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1264; see Civ. Code, § 1636.) "If contractual language is clear and explicit, it governs." (*Bank of the West*, at p. 1264; see Civ. Code, § 1638.) If the terms are ambiguous [i.e., susceptible of more than one reasonable interpretation], we interpret them to protect " 'the objectively reasonable expectations of the insured.' " (*Bank of the West*, at p. 1265, quoting *AIU Ins. Co. v. Superior Court* (1990) 51 Cal.3d 807, 822 [(*AIU Ins.*)].) Only if these rules do not resolve a claimed ambiguity do we resort to the rule that ambiguities are to be resolved against the insurer. (*Bank of the West*, at p. 1264.)' (*Boghos v. Certain Underwriters at Lloyd's of London* (2005) 36 Cal.4th 495, 501.) The 'tie-breaker' rule of construction against the insurer stems from the recognition that the insurer

7

generally drafted the policy and received premiums to provide the agreed protection. [Citations.]" (*Minkler v. Safeco Ins. Co. of America* (2010) 49 Cal.4th 315, 321 (*Minkler*).)

"To further ensure that coverage conforms fully to the objectively reasonable expectations of the insured, the corollary rule of interpretation has developed that, in cases of ambiguity, basic coverage provisions are construed broadly in favor of affording protection, but clauses setting forth specific exclusions from coverage are interpreted narrowly against the insurer. The insured has the burden of establishing that a claim, unless specifically excluded, is within basic coverage, while the insurer has the burden of establishing that a specific exclusion applies. [Citations.]" (*Minkler*, *supra*, 49 Cal.4th at p. 322.)

"The existence of a material ambiguity in the terms of an insurance policy may not, of course, be determined in the abstract, or in isolation. The policy must be examined as a whole, and in context, to determine whether an ambiguity exists. (*MacKinnon* [*v. Truck Ins. Exchange* (2003)] 31 Cal.4th 635, 648; *Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 18.)" (*Minkler*, *supra*, 49 Cal.4th at p. 322.)

B. Analysis

Here, the Policy includes a Special Property Coverage Form that states that Sentinel "will pay for direct physical loss of or physical damage to Covered Property . . . caused by or resulting from a Covered Cause of Loss." The Policy provides additional coverages that supplement this basic grant of first party coverage, including under the Business Income and Extra Expense provisions. When applicable, the Business Income and Extra Expense provisions cover Brooklyn's "actual loss of Business Income" incurred due to a suspension of operations during the " 'period of restoration,' " provided that

8

the suspension was caused by "direct physical loss of or physical damage to" covered property, "caused by or resulting from a Covered Cause of Loss," together with "reasonable and necessary Extra Expense" incurred during the " 'period of restoration' " that Brooklyn "would not have incurred if there had been no direct physical loss or physical damage to property" at the insured premises.

In light of these provisions (and an additional endorsement discussed *post*), Brooklyn frames the question to be decided by this appeal as follows: "The ultimate question presented here is whether Brooklyn's loss of property owned, leased, or used by Brooklyn itself or its dependent property customers, because of unsafe conditions created by COVID-19 infection, in and around the facilities, is either a 'damage to property' or a 'loss of property' under the Policy." To the extent Brooklyn asks us to address this question under the Policy regarding the Special Property Coverage Form as well as the Business Income and Extra Expense provisions discussed *ante*, we note that several California courts have found no coverage under similar policies. (See, e.g., *Apple Annie, LLC v. Oregon Mutual Ins. Co.* (2022) 82 Cal.App.5th 919, 928–935; *United Talent Agency v. Vigilant Ins. Co.* (2022) 77 Cal.App.5th 821, 834 (*United Talent*); *Musso & Frank Grill Co., Inc. v. Mitsui Sumitomo Ins. USA Inc.* (2022) 77 Cal.App.5th 753, 760–761; *Inns-by-the-Sea v. California Mutual Ins. Co.* (2021) 71 Cal.App.5th 688, 700–701.) In doing so, the appellate courts have determined that, as a matter of law, the mere presence of the coronavirus on the surface of the covered premises is insufficient to allege damage to the property or a direct physical loss. (See *Endeavor Operating Co., LLC v. HDL Global Ins. Co.* (2023) 96 Cal.App.5th 420, 440, review granted, Dec. 13, 2023, S282533; *United Talent*, at pp. 834, 838.) If this case hinged on Brooklyn's allegations

9

that the evanescent presence of the virus on the surface of Harry's Coffee Shop constituted damage to the property or loss of property under the Policy, we would follow the cases cited *ante* and affirm the judgment on the grounds that Brooklyn has not and cannot allege damage or loss to the insured premises.[3]

For these same reasons, we also reject Brooklyn's claim that the presence of the coronavirus on "Dependent Properties" as defined under the Policy gives rise to coverage here. The only damage or loss Brooklyn claims may exist at the Dependent Properties is the presence of the coronavirus. Such allegations are not sufficient to allege the requisite loss or damage as required under the Policy. (See *United Talent*, *supra*, 77 Cal.App.5th at pp. 834, 838.)

Yet, we do not end our consideration of the appeal here. As Brooklyn represents, this case is different because the Policy includes the Virus Endorsement. We thus consider Brooklyn's claim that coverage exists based on the allegations of the complaint measured against that endorsement.

The Virus Endorsement actually begins with exclusions, detailing what Sentinel was not required to pay based on the amendments the endorsement made to the "Increased Cost of Construction Additional Coverage of the Standard Property Coverage Form." In addition, the Virus Endorsement

---

[3]     We acknowledge that a minority of appellate courts have concluded that, in similar insurance coverage cases, the allegations that the virus is present on the surface of the insured premises is sufficient to withstand demurrer. (See *Marina Pacific Hotel & Suites, LLC v. Fireman's Fund Ins. Co.* (2022) 81 Cal.App.5th 96, 104–105; *Shusha, Inc. v. Century-National Ins. Co.* (2022) 87 Cal.App.5th 250, 262–263, review granted Apr. 19, 2023, S278614.) However, we do not ascribe to the minority view expressed by this line of cases.

offers other exclusions toward the beginning of the provision (the Virus Exclusion):

> "i. 'Fungi', Wet Rot, Dry Rot, Bacteria And Virus
>
> "We will not pay for loss or damage caused directly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss:
>
> "(1) Presence, growth, proliferation, spread or any activity of 'fungi', wet rot, dry rot, bacteria or virus.
>
> "(2) But if 'fungi', wet rot, dry rot, bacteria or virus results in a 'specified cause of loss' to Covered Property, we will pay for the loss or damage caused by that 'specified cause of loss'."

However, the above exclusion includes a carve out for certain specified causes as follows:

> "This exclusion does not apply:
>
> "(1) When 'fungi', wet or dry rot, bacteria or virus results from fire or lightning; or
>
> "(2) To the extent that coverage is provided in the Additional Coverage – Limited Coverage for 'Fungi', Wet Rot, Dry Rot, Bacteria and Virus with respect to loss or damage by a cause of loss other than fire or lightning.
>
> "This Exclusion applies whether or not the loss event results in widespread damage or affects a substantial area."

Further, the Virus Endorsement specifically adds language to the "Additional Coverage" provision of the Special Property Coverage Form (the Limited Virus Coverage). It provides coverage as follows:

> "The coverage . . . only applies when the 'fungi', wet or dry rot, bacteria or virus is the result of one or more of the following causes that occurs during the policy period and only if all reasonable means were used to save and preserve

11

the property from further damage at the time of and after that occurrence.

"(1) A 'specified cause of loss' other than fire or lightning;

"(2) Equipment Breakdown Accident occurs to Equipment Breakdown Property, if Equipment Breakdown applies to the affected premises."

"b. We will pay for loss or damage by 'fungi', wet rot, dry rot, bacteria and virus. As used in this Limited Coverage, the term loss or damages means:

"(1) Direct physical loss or direct physical damage to Covered Property caused by 'fungi', wet rot, dry rot, bacteria or virus, including the cost of removal of the 'fungi', wet rot, dry rot, bacteria or virus;

"(2) The cost to tear out and replace any part of the building or other property as needed to gain access to the 'fungi', wet rot, dry rot, bacteria or virus; and

"(3) The cost of testing performed after removal, repair, replacement or restoration of the damaged property is completed, provided there is a reason to believe that 'fungi', wet rot, dry rot, bacteria or virus are present."

The Virus Endorsement does not include a definition of "Specified Cause of Loss." Nonetheless, elsewhere in the Policy, that phrase is defined as follows: " 'Specified Cause of Loss' means the following: Fire; lightning; explosion, windstorm or hail; smoke; aircraft or vehicles; riot or civil commotion; vandalism; leakage from fire extinguishing equipment; sinkhole collapse; volcanic action; falling objects; weight of snow, ice or sleet; water damage." The parties do not argue that there existed other specified causes of loss under the Policy except those that we have just identified.

Here, although the Virus Endorsement begins with exclusions and the parties spend a great portion of their briefs discussing the impact of these exclusions on the coverage issue before us, we begin with analysis of the

12

coverage provided in the Limited Virus Coverage because if Brooklyn's claims are not covered under that provision, we need not consider the endorsement's exclusions.  (See *Hallmark Ins. Co. v. Superior Court* (1988) 201 Cal.App.3d 1014, 1017 ["a court must examine the coverage provisions to determine whether a claim falls within the potential ambit of the insurance.  [Citations.] Where the scope of the basic coverage itself clearly creates no potential liability under the policy, a court may not give it a 'strained construction' to impose on an insurer a liability the insurer has not assumed"]; *Yahoo, Inc. v. National Union Fire Ins. Co. etc.* (2022) 14 Cal.5th 58, 68 (*Yahoo*) ["When coverage is in dispute, the initial burden is on the insured . . . to prove that its claim falls within the scope of potential coverage.  [Citation.]  If the insured establishes that the policy provides at least the potential for coverage, the burden shifts to the insurer . . . to show the claim falls within one of the policy's exclusions."].)

As relevant here, the Limited Virus Coverage requires Sentinel to pay, subject to certain exclusions and requirements, "loss or damage" caused by a virus.  The Limited Virus Coverage includes a definition for "loss or damage" specific to its coverage provision.  To this end, the Limited Virus Coverage provides three subsections to define "the term loss or damage":

> "(1)  Direct physical loss or direct physical damage to Covered Property caused by . . . virus, including the cost of removal of the . . . virus;
>
> "(2)  The cost to tear out and replace any part of the building or other property as needed to gain access to the . . . virus; and
>
> "(3)  The cost of testing performed after removal, repair, replacement or restoration of the damaged property is completed, provided there is a reason to believe that . . . virus [is] present."

13

The parties disagree regarding the definition of "loss or damage" in the Limited Virus Coverage. Brooklyn argues that the definition is more expansive than what most California courts have considered in similar insurance coverage cases because it specifically includes the cost of removal of a virus as a type of loss or damage. Further, Brooklyn emphasizes that its interpretation of the Limited Virus Coverage is the same as the First District's reading of a substantially similar policy in *John's Grill, Inc. v. The Hartford Financial Services Group, Inc.* (2022) 86 Cal.App.5th 1195, review granted March 29, 2023, S278481 (*John's Grill*).

Sentinel disagrees with Brooklyn's reading of the definition of "loss or damage" in the Limited Virus Coverage. It contends that provision "simply clarifies *if* a virus . . . causes direct physical loss or damage, *then* the Policy will pay for that physical loss or damage *and also* will pay for the cost to remove the virus . . . that caused the physical loss or damage." Thus, Sentinel reads the subject clause, not as further specifying what could be considered direct physical loss or direct physical damage but as clarifying what Sentinel would pay for if Harry's Coffee Shop incurred a direct physical loss or direct physical damage caused by a virus. Moreover, Sentinel maintains its reading "comports with the Policy as a whole." To this end, Sentinel emphasizes that the "Policy generally requires *physical* loss or damage, and the Virus Exclusion separately bars coverage for loss or damage caused by a virus (or other listed peril)." Although Sentinel acknowledges that the Limited Virus Coverage "reinstates some of that excluded coverage," Sentinel insists the "cost of removal" language only clarifies that "*associated* costs like removal and testing will also be covered in certain circumstances, along with the underlying physical loss or damage."

14

In interpreting an insurance policy, the "mutual intention of the parties at the time the contract is formed governs interpretation.  [Citation.]  Such intent is to be inferred, if possible, solely from the written provisions of the contract."  (*AIU Ins.*, *supra*, 51 Cal.3d at pp. 821-822.)  The words in the contract are to be interpreted in their "ordinary and popular sense" unless "used by the parties in a technical sense, or unless a special meaning is given to them by usage."  (Civ. Code, § 1644.)  Any ambiguous terms must be interpreted "in the sense [the insurer] believed [the insured] understood them at the time of formation," and ambiguities must be resolved in favor of coverage.  (*AIU Ins.*, at p. 822, citing Civ. Code, § 1649; *Yahoo*, *supra*, 14 Cal.5th at p. 67 [if policy terms " 'are ambiguous [i.e., susceptible of more than one reasonable interpretation], we interpret them to protect " 'the objectively reasonable expectations of the insured.' "  [Citations.]  Only if these rules do not resolve a claimed ambiguity do we resort to the rule that ambiguities are to be resolved against the insurer' "].)

Here, we begin by interpreting the first of three separate subsections under the Limited Virus Coverage that provide a definition for "the term loss or damage" under the Virus Endorsement.  The first subsection refers to "[d]irect physical loss or direct physical damage to [Harry's Coffee Shop] caused by [a] . . . virus, ***including the cost of removal of the . . . virus.***" (italics and bold added.)  The word "include" is a transitive verb meaning "to take in or comprise as part of a whole or group."[4]  As such, the use of the word "include" indicates that "cost of removal" is part of the whole of the sentence (here, "[d]irect physical loss or direct physical damage . . . caused by [a] . . . virus"]).  In other words, the first subsection expressly makes "cost of

[4]     Merriam-Webster's Online Dict. (2024) <https://www.merriam-webster.com/dictionary/include> [as of March 20, 2024] archived at <https://perma.cc/WL8M-C8XY>.)

removal" *part* of the definition of direct physical loss or direct physical damage. There does not exist any requirement that some additional "direct physical loss or direct physical damage" must occur before "cost of removal" can be considered "loss or damage" under the Limited Virus Coverage. Nor does the subsection state that if a virus causes direct physical damage or loss to the insured premises then Sentinel will pay for the cost of removal.

Despite disagreeing that Brooklyn has alleged direct physical loss or damage giving rise to coverage under the Policy, Sentinel appears to concede that in using the term "including," the Limited Virus Coverage makes clear that "cost of removal" "is 'contain[ed] as part of' direct physical loss or physical damage for purposes of the 'loss or damage' definition." Nonetheless, Sentinel insists because the cost of removal is part of direct physical loss or direct physical damage, "[i]t does not, therefore, independently constitute 'loss or damage' as defined in the Limited [Virus] Coverage." This argument borders on nonsensical. In essence, Sentinel seems to be contending that because the Limited Virus Coverage specifically incorporates "cost of removal" as a part of the definition of "direct physical loss or direct physical damage," any "loss or damage" under this provision must constitute more than the "cost of removal." Alternatively stated, according to Sentinel, if the virus causes some direct physical loss or direct physical damage, independent of the cost of removal, only then is Sentinel required to pay for the cost of removing a virus. But that is not what the Policy says. The Limited Virus Coverage does not limit "the term loss or damage" to only "direct physical loss or direct physical damage" or as it might be used in other provisions of the Policy. Instead, the first subdivision plainly states that "[d]irect physical loss or direct physical damage . . . caused by . . . virus, includ[es] the cost of removal of the . . . virus." Therefore, for

16

purposes of alleging "loss or damage" that *could* trigger coverage under the Limited Virus Coverage, we conclude it is a reasonable interpretation of that provision that the mere incurring of the cost of removal would be a sufficient "direct physical loss or direct physical damage." If we were to adopt Sentinel's interpretation of the first subsection of the Limited Virus Coverage, we would have to ignore the word "include" or otherwise rewrite this subdivision. We decline to engage in such contract drafting. That is not our role here.

Further, our understanding of this provision is supported by the First District's interpretation of the Limited Virus Coverage in *John's Grill, supra*, 86 Cal.App.5th 1195, review granted. There, in explaining a substantially similar commercial property policy Sentinel provided to a restaurant, the court noted:

> "Unlike the undefined phrase 'direct physical loss of or physical damage to' property in the Special Property Coverage Form, the key coverage-triggering phrase in the Limited Virus Coverage grant is simply 'loss or damage,' which is specially defined in a manner that not only contemplates the possibility a virus may 'cause[ ]' physical damage to covered property, but that includes the costs of 'removal' of 'virus'—a phrase capacious enough to include cleaning the surfaces of the property—as well as testing to detect whether virus is merely 'present' on the property." (*Id.* at p. 1212.)

Thus, we turn to the allegations of the operative complaint to see if Brooklyn alleged that it incurred "the cost of removal" of the coronavirus. Although it did not use that exact phrase in the first amended complaint, we observe that Brooklyn averred that it incurred significant additional expenses "through enhanced and continual sanitation of . . . [Harry's Coffee Shop] in order to help mitigate the impacts of business interruption and continue operations in some decreased capacity." Because we must liberally

17

construe the allegations in a complaint when determining whether a plaintiff has stated a valid cause of action (see, e.g., *Gomez v. Lincare, Inc.* (2009) 173 Cal.App.4th 508, 522; Code Civ. Proc., § 452), we read the allegations that Brooklyn engaged in "enhanced and continual sanitation" of Harry's Coffee Shop as an allegation that it incurred the cost of removal of the coronavirus to keep Harry's Coffee Shop at least partially open. Accordingly, we conclude that Brooklyn sufficiently alleged that it suffered the requisite "loss or damage" under the Limited Virus Coverage to potentially trigger coverage under the Virus Endorsement.

We next address whether the Virus Exclusion establishes as a matter of law that Brooklyn is not entitled to coverage based on its allegation that it incurred the "cost of removal" of the coronavirus from the surfaces of Harry's Coffee Shop. Sentinel urges us to answer this question in the affirmative, maintaining that the Virus Exclusion "unambiguously bars coverage for Brooklyn's claimed losses." To this end, Sentinel emphasizes that the Virus Limitation expressly states Sentinel "will not pay for loss or damage caused directly or indirectly by" the "[p]resence, growth, proliferation, spread or any activity of . . . [a] virus."

However, Sentinel acknowledges that the Virus Exclusion does not apply when a virus "results from fire or lighting" or "coverage is provided" under the Limited Virus Coverage "with respect to loss or damage by a cause of loss other than fire or lightning."[5] In addition to the defining "loss or damage" as discussed *ante*, the Limited Virus Coverage sets forth that its coverage "only applies when the . . . virus is the result of one or more of the

_____

[5]    Brooklyn does not allege that the coronavirus was caused by fire or lightning. Accordingly, we do not discuss possibility of coverage under those two causes any further.

following causes . . . and only if all reasonable means were used to save and preserve the property from further damage at the time of and after that occurrence." It further specifies the applicable causes as "[a] 'specified cause of loss' other than fire or lightning" or "Equipment Breakdown Accident occurs to Equipment Breakdown Property, if Equipment Breakdown applies to the affected premises."[6] Although not defined in the Virus Endorsement, the Policy identifies the following specified causes of loss that will trigger coverage in general: "Fire; lightning; explosion, windstorm or hail; smoke; aircraft or vehicles; riot or civil commotion; vandalism; leakage from fire extinguishing equipment; sinkhole collapse; volcanic action; falling objects; weight of snow, ice or sleet; water damage." And Sentinel insists that Brooklyn has not and cannot allege that the coronavirus resulted from any of the enumerated specified causes of loss under the Policy. Thus, Brooklyn has no claim that it is entitled to coverage based on the coronavirus.

In response, Brooklyn points out that it alleged that the coronavirus was transported to the United States, and eventually to Harry's Coffee Shop, by airplanes, which is a specified cause of loss under the Policy. Therefore, Brooklyn maintains that the allegations that "travelers originating from other states and countries came to the state [in airplanes and vehicles] where the insured properties are located and, in turn, infected the insured property (including associated dependent properties)" is analogous to allegations a court found the plaintiff had sufficiently pled a covered loss under an insurance policy wherein a virus was transmitted by wind. (See *Curtis O. Griess & Sons, Inc. v. Farm Bureau Ins. Co. of Nebraska* (1995) 247 Neb. 526,

_____

6 "Equipment Breakdown Accident" is defined elsewhere in the Policy. Sentinel argues, and Brooklyn does not contest, that Brooklyn does not invoke coverage under the Equipment Breakdown Accident provision. As such, we eschew any further discussion of it.

19

531 [528 N.W.2d 329, 333] (*Curtis O*.).)  We find Brooklyn's reliance on *Curtis O.* misplaced.

In *Curtis O.*, the Supreme Court of Nebraska determined that a tornado carried a pseudorabies virus to the plaintiff's swine "insured by defendant insurance company for physical loss caused directly by an applicable peril," where windstorms were covered perils under the policy. (*Curtis O., supra*, 528 N.W.2d at p. 331.)  The court determined that the virus "ha[d] been transmitted by means of a covered peril" and that "[a]bsent the windstorm, there would have been no infection of plaintiff's swine." (*Id.* at p. 333.)  We disagree with Brooklyn that the vehicles and airplanes in the instant matter are the same as the wind in *Curtis O.*  As Brooklyn explicitly alleges, it was the people traveling on the airplanes and vehicles that carried the coronavirus.  Thus, it was not airplanes and vehicles themselves that caused the spread of the virus.  Without the people traveling on those airplanes and vehicles, there would have been no spread of the coronavirus.  Therefore, the airplanes and vehicles are much more attenuated to the alleged covered loss than the wind transporting the virus in *Curtis O.* (See *Firenze Ventures LLC v. Twin City Fire Ins. Co.* (N.D. Ill. 2021) 532 F.Supp.3d 607, 612–613 ["The fact that human beings use various conveyances to travel from Point A to Point B does not mean that anything caused by what they do (intentional or not) at Point B is 'the result of' the conveyance they used.  If a person catches a cold in New York one night, flies to Chicago the next morning, takes an Uber downtown to her hotel, and then sneezes on her bellhop in the elevator, no speaker of ordinary English would say that the bellhop's ensuing cold was 'the result of' the aircraft or the Uber"].)

20

Despite having rejected Brooklyn's argument that it has alleged the coronavirus was the result of a specified cause of loss under the Policy, our analysis here is not finished. Brooklyn further argues that if an airplane or vehicle is not a sufficient specific cause of loss under the Policy then nothing is regarding viruses. In other words, the Policy is illusory.

"In order for a contract to be valid, the parties must exchange promises that represent legal obligations. [Citation.] An Agreement is illusory and there is no valid contract when one of the parties assumes no obligation." (*Scottsdale Ins. Co. v. Essex Ins. Co.* (2002) 98 Cal.App.4th 86, 94–95; see *French Laundry Partners, LP v. Hartford Fire Ins. Co.* (N.D.Cal. 2021) 535 F.Supp.3d 897, 904 (*French Laundry*) [under California law, "[a]n insurance policy provision is only illusory where it results in a 'complete lack of any policy coverage' "].) Under the rules of contractual interpretation, "we must interpret the provisions of a contract to avoid rendering the instrument 'illusory.' [Citation.] Contracts of insurance do not enjoy any special exemption from that basic principle." (*John's Grill*, *supra*, 86 Cal.App.5th at p. 1219, review granted; see *Brandwein v. Butler* (2013) 218 Cal.App.4th 1485, 1507 ["when interpreting a contract, we strive to interpret the parties' agreement to give effect to all of a contract's terms, and to avoid interpretations that render any portion superfluous, void or inexplicable"].)[7]

---

[7] Relying on *Forecast Homes, Inc. v. Steadfast Ins. Co.* (2010) 181 Cal.App.4th 1466 at pages 1483 through 1484, Sentinel contends that a condition in an insurance policy can only render the subject policy illusory if the existence of that condition is entirely within the insurer's control. We do not read that case as establishing whether an insurance policy is illusory so narrowly. Because insurance policies are a species of contract, we apply the general rules of determining whether a contract is illusory to the Policy in the instant action as sort forth *ante*.

In the instant matter, Sentinel offers two primary reasons why the Policy is not illusory. First, it points out that the Virus Endorsement is not limited to only viruses but provides coverage for loss or damage caused by fungi, wet or dry rot, and bacteria. As long as any one of these perils can result from a specified cause of loss, Sentinel contends the Policy is not illusory. We disagree. Further, we think the First District persuasively addressed this argument in *John's Grill, supra,* 86 Cal.App.5th at page 1222, review granted:

> "[Sentinel's argument] not only flies in the face of the principle that we must give effect to all the words of the Policy, but is precisely the kind of 'heads I win, tails you lose' position the illusory coverage doctrine forbids. . . . Insurers cannot take in premium for a coverage grant that names a specifically covered risk—here virus contamination—and then justify denying coverage for it under all circumstances because some other risk may be covered under the same coverage grant."

Next, Sentinel asserts that the Policy is not illusory because, as set forth in *Curtis O., supra,* 528 N.W.2d 329, a virus can result from a windstorm, which is a specified cause of loss. Sentinel further points out that multiple federal cases have accepted this argument in finding that substantially similar policies were not illusory,[8] but we agree with the First District that, for purposes of our analysis here, *Curtis O.* "is best limited to its peculiar factual context." (*John's Grill, supra,* 86 Cal.App.5th at p. 1223, review granted.) *Curtis O.* concerned the harm a windblown virus caused to livestock on a farm. (*Curtis O., supra,* 528 N.W.2d at p. 333.) But Brooklyn

8    See, e.g., *Hair Perfect Int'l, Inc. v. Sentinel Ins. Co., Ltd* (C.D.Cal. May 20, 2021, No. LA CV20-03729 JAK (KSx)) 2021 U.S.Dist. LEXIS 102637, at \*23; *French Laundry, supra,* 535 F.Supp.3d at pp. 903–904; *Franklin EWC, Inc. v. Hartford Fin. Servs. Grp.* (N.D.Cal. 2020) 506 F.Supp.3d 854, 861.

does not operate a farm, and the insured premises under the Policy is a restaurant. Unlike the farm in *Curtis O.*, there is no livestock present at Harry's Coffee Shop to be harmed by a virus traveling via a windstorm. In this sense, we concur with the First District that this "oddball scenario[ ]" has little applicability to the instant matter.

Additionally, in a single sentence of its 58-page brief, Sentinel insists that the Policy is not illusory because a virus could result from other specified causes of loss. To this end, Sentinel asserts: "waterborne viruses can result from 'water damage,' and a virus could result from other specified causes like 'vandalism' or 'civil commotion' at, for example, a virus-testing facility or virology research lab." But for this lone, conclusory remark, Sentinel provides no explanation in its brief how these scenarios are either realistic or even remotely possible.

Moreover, the reasonableness of these examples was further undermined by Sentinel's claim during oral argument that, to the extent the Virus Endorsement did provide any coverage to Brooklyn, it would only do so if a virus damaged a living organism, like oysters or plants, at Harry's Coffee Shop. Such an argument begs the question why Brooklyn would purchase such a policy to cover the diner it operates. There is no indication here that Harry's Coffee Shop keeps living creatures on its premises or was seeking specific coverage for any type of husbandry.

Thus, again we are inclined follow *John's Grill* on this point. (See *John's Grill, supra*, 86 Cal.App.5th at p. 1224, review granted ["Where an insured properly raises the issue of illusory coverage, as [the insured] has done here, unsubstantiated speculation, untethered to the insured's actual business circumstances as underwritten by the insurer, is not enough to defeat the argument"].) Our decision to follow *John's Grill* regarding this

23

issue is buttressed by the fact that this case is at the pleading stage and there is not a sufficient record before us to ascertain the parties' intentions of entering into the Policy. (Cf. *Bank of the West v. Superior Court, supra,* 2 Cal.4th at p. 1264; Civ. Code, § 1636.) Such development of the facts and evidence appears to be necessary here where the parties seem to be at such severe loggerheads regarding what the Policy was meant to cover.[9]

## DISPOSITION

The judgment is reversed. The matter is remanded to the superior court with directions to enter an order denying Sentinel's motion for judgment on the pleadings. Brooklyn is entitled to its costs on appeal.

HUFFMAN, Acting P. J.

WE CONCUR:

DATO, J.

CASTILLO, J.

---

[9] Because we are reversing the judgment based on Brooklyn's illusory argument, we need to reach its claim that the Virus Exclusion is unenforceable because that exclusion was not sufficiently conspicuous, plain, or clear.

Filed 3/25/24

| | |
|---|---|
| BROOKLYN RESTAURANTS, INC., <br><br> Plaintiff and Appellant, <br><br> v. <br><br> SENTINEL INSURANCE COMPANY, LTD., <br><br> Defendant and Respondent. | D081132 <br><br><br> (Super. Ct. No. 37-2020-00024865-CU-IC-CTL) <br><br> ORDER CERTIFYING OPINION FOR PUBLICATION |

THE COURT:

The opinion in this case filed March 20, 2024 was not certified for publication. It appearing the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c), the request pursuant to rule 8.1120(a) for publication is GRANTED.

IT IS HEREBY CERTIFIED that the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c); and

ORDERED that the words "Not to Be Published in the Official Reports" appearing on page one of said opinion be deleted and the opinion herein be published in the Official Reports.

HUFFMAN, Acting P. J.

Copies to:  All parties

2